## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| PRIME TRADING COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 154 |
| v. | ) | |
| | ) | Judge Kennelly |
| R.J. O'BRIEN & ASSOCIATES, INC., an | ) | Magistrate Judge Ashman |
| Illinois Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

COMES NOW the Defendant, R.J. O'Brien & Associates, LLC ("RJO") incorrectly sued as R.J. O'Brien & Associates, Inc., by and through its attorneys, and files its Brief in Support of Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.

## INTRODUCTION

On January 8, 2008, Plaintiff Prime Trading Company, Inc. ("Prime Trading") filed suit against RJO. The Complaint for Damages and Demand for Jury Trial ("Complaint") is attached as Exhibit 1. The Complaint alleges that the Commodity Futures Trading Commission ("CFTC") filed its First Amended Complaint for Injunctive and Other Equitable Relief and For a Civil Monetary Penalty ("CFTC Complaint") against Plaintiff and others. (Complaint ¶5). The Complaint "incorporates herein by reference, the allegations set forth in the CFTC Complaint." (Complaint ¶6). The CFTC Complaint alleges that Plaintiff and others violated federal laws and regulations and committed fraud and executed unauthorized trades in numerous Nebraska farmers' commodity accounts. (Complaint, Exhibit A ¶¶78-101). As a result of Plaintiff's fraud

and unauthorized trading, the Nebraska farmers lost approximately $5,100,000.00. (Complaint ¶8).

On or about December 17, 2007, the United States District Court for Nebraska entered the Consent Order of Permanent Injunction and Other Equitable Relief ("Consent Order"). (Complaint ¶9). Plaintiff was "permanently restrained, enjoined, and prohibited from," *inter alia*, "cheating or defrauding or attempting to cheat or defraud another person; and/or willfully deceiving or attempting to deceive another person by any means whatsoever in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of another person . . .." (Complaint, Exhibit B ¶40). Plaintiff and others were held jointly and severally liable to pay restitution to certain Nebraska farmers in the amount of $325,000. (Complaint, Exhibit A ¶¶47-48).

Thus, Plaintiff has been enjoined and held jointly and severally liable, along with five others, for its fraud and unauthorized trading. Plaintiff has alleged seven claims against RJO asking this Court in essence to make RJO pay for Plaintiff's fraud and unauthorized trading despite the fact that there is not one allegation by the Plaintiff or CFTC that RJO had anything whatsoever to do with Plaintiff's fraud and unauthorized trading. Incredibly, Plaintiff also asks, with no justification whatsoever, that RJO be ordered to pay Plaintiff's attorney fees in defending against the CFTC's investigation of Plaintiff's alleged illegal activities and ensuing Complaint.

## **ARGUMENT**

## I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

All seven claims in Plaintiff's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. In

addressing a motion to dismiss pursuant to Rule 12(b)(6), the "court assumes that all *factual allegations in the complaint are true and draws all reasonable inferences in favor of plaintiffs.*" *Industrial Hard Chrome, Ltd. v. Hertran, Inc.*, 64 F. Supp.2d 741, 744 (N.D. Ill. 1999) (emphasis added). "While the Federal Rules of Civil Procedure provide a liberal notice pleading standard, the complaint must include either direct or inferential allegations with respect to all material elements of the claims asserted." *Id.* "Bare legal conclusions attached to narrated facts will not suffice." *Id.* In other words, "[a] complaint must set forth *factual* allegations that outline the essential elements of the claim, and legal conclusions lacking adequate support should not be considered." *Hoopla Sports and Entertainment, Inc. v. Nike, Inc.*, 947 F. Supp. 347, 356 (N.D. Ill. 1996) (emphasis added).

### A.    Plaintiff's Complaint Fails To State A Claim For Breach Of Contract.

Plaintiff's breach of contract claim (Complaint ¶¶40-47) should be dismissed because (i) it states the bare legal conclusion that the Plaintiff was a third-party beneficiary to the Security Agreement; (ii) states the bare legal conclusion that the Security Agreement was breached; and (iii) Plaintiff fails to allege damages as a result of the breach.

Under Illinois law a third-party may sue for breach of contract "if that contract was entered into for the direct benefit of that third party." *Industrial Hard Chrome, Ltd.,* 64 F. Supp.2d at 744. Plaintiff's complaint is insufficient because it contains the bare legal conclusion that Plaintiff "was a  third-party beneficiary to the Security Agreement," (Complaint ¶40), but no facts in support of that conclusion. Plaintiff's Complaint does not contain any allegations that the contract was entered into for the direct benefit of Plaintiff. Northern District of Illinois precedent is clear that "[a] complaint must set forth factual allegations that outline the essential elements of the claim, and legal conclusions lacking adequate support should not be considered."

*Hoopla Sports and Entertainment, Inc.*, 947 F. Supp. at 356. *See also Industrial Hard Chrome, Ltd.,* 64 F. Supp.2d at 744 (stating that bare legal conclusions are insufficient).

Furthermore, Plaintiff merely states the bare legal conclusion that RJO breached the Security Agreement when it refused to accept certain orders on April 29, 2003. (Complaint ¶42). "[A] conclusory allegation of a breach is insufficient; counterplaintiffs must state the facts underlying the breach." *Servpro Industries, Inc. v. Schmidt*, 905 F. Supp. 475, 479 (N.D. Ill. 1995). Plaintiff fails to allege what promises in the Security Agreement created any duty on the part of RJO to accept and place the orders. *Id.* (noting that plaintiffs failed to allege what promises were breached).

And, Plaintiff fails to allege damages as a result of the breach. "An adequate complaint based upon breach of contract must allege the existence of damages as consequence of the breach." *Feldstein v. Guinan*, 499 N.E.2d 535, 537 (Ill. App. Ct. 1st Dist. 1986). "Speculative damages or damages not the proximate result of the breach will not be allowed. *Id.* Plaintiff seeks the $325,000 in restitution for which it was held jointly and severally liable. (Complaint ¶45). As shown by the Complaint and Exhibits attached to the Complaint the restitution is not the consequence of the RJO's alleged breach of the Security Agreement. The $325,000 in restitution is because of Plaintiff's fraud and unauthorized trading in Nebraska farmer's accounts. The Consent Order provides:

> Based on purposes identified in paragraph 24 [certain defendants] placed 24 positions in the program during [April 2002 through at least March 2003]. Of these 24 positions, however, 14 were not bona fide hedge transactions . . . in that they did not decrease the farmer's risk of a fall in the price of their cash corn crop. These 14 positions caused [Prime Trading Company's] customers to incur approximately $2 million in losses in their trading accounts that they would not have otherwise incurred had the transactions not been placed. Before the Commission's Amended Complaint was filed in this case, defendants had voluntarily signed settlement agreements with 89 0f 90 farm customers and paid those customers back approximately $1.4 million.

(Complaint, Exhibit B ¶25). Thus, the losses in the Nebraska farmers' accounts are the result of the fraud and the unauthorized transactions that Prime Trading placed in those accounts. Hence, the $325,000 in restitution is not a consequence of RJO's alleged breach of the Security Agreement.[1]

Additionally, nowhere in the Complaint does Plaintiff allege that it actually paid the $325,000. Indeed, all six of the defendants in the CFTC Action were held jointly and severally liable in the Consent Order and four of those defendants have also filed suit against RJO seeking the same $325,000. Thus, these damages are speculative at best.

The Plaintiff also seeks $600,000 incurred in attorney fees in defending the CFTC investigation of the alleged fraud and unauthorized trading and the Complaint that sought to hold Plaintiff liable for fraud and unauthorized trading. These attorney fees are the result of the CFTC seeking to hold Plaintiff liable for fraud and unauthorized trading, not RJO's alleged breach of contract. Thus, RJO is not responsible for Plaintiff's attorney fees. Moreover, as with the restitution, Plaintiff does not allege that it has actually paid any of the attorney fees. (Complaint ¶46).

Furthermore, Illinois follows the "'American Rule': absent statutory authority or a contractual agreement between the parties, each party to litigation must bear its own attorney fees and costs, and may not recover those fees and costs from an adversary." *Morris B. Chapman & Associates, LTD. v, Kitzman*, 739 N.E.2d 1263, 1271 (Ill. 2000). Given this rule, it is clear that Plaintiff cannot thrust its legal fees from another action upon RJO.

---

[1] The CFTC sought restitution "to every customer whose funds were received by [defendants] as a result of acts and practices which constituted violations of the [federal Commodity Exchange] Act and Regulations . . . (Complaint, Exhibit A Relief Requested (e)).

Lastly, Plaintiff alleges:

> **If** Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and **if** Plaintiff will have to pay any further restitution to the Prime Customers for any of these alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of RJO's breaches of the Security Agreement.

(Complaint ¶46). These damages are speculative because they are not and may not ever be in existence. Furthermore, they are not a consequence of the alleged breach. If these damages were a consequence of the alleged breach, they would be in existence now. Plaintiff does not and cannot allege the existence of damages as consequence of the breach. Because Plaintiff has failed to allege the elements of the breach of contract claim, that claim should be dismissed.

### B.    Plaintiff's Complaint Fails To State A Claim For Common Law Indemnity.

Under Illinois law, implied indemnity is available to a principal who, through no fault of its own, is held liable for its agent's negligent tort against a third party. *BCS Ins. Co. v. Guy Carpenter & Co.*, 490 F.3d 597, 603 (7th Cir. 2007). "Furthermore, implied indemnity is applied in situations where 'the indemnitee, although without fault in fact, has been subjected to liability *solely because of the legal relationship with the plaintiff* or a nondelegable duty arising out of common or statutory law.' *Id*. (emphasis in original) (citations omitted). "To prevail on a claim for implied indemnity, a plaintiff must establish: (1) that there was a pre-tort relationship between the indemnitor and the indemnitee, and (2) that the indemnitee was held derivatively liable for the acts of the indemnitor." *Id*. Under Illinois law, "implied indemnity arises in cases of vicarious liability." *Ganci v. Blauvelt*, 690 N.E.2d 649, 651 (Ill. App. Ct. 4th Dist. 1998).

Plaintiff clearly fails to state a claim for implied indemnity. First, there are no allegations that Plaintiff is a principal and RJO was its agent. Secondly, there is no allegation that Plaintiff's

alleged fraud resulted from RJO's actions. The CFTC sought to hold Plaintiff liable for its own

fraud and unauthorized trading. (Complaint ¶¶ 5,6). Therefore, Plaintiff was *not* without fault,

and Plaintiff was *not* being held liable for RJO's negligence. In sum, Plaintiff simply does not,

and cannot, allege that its liability for its fraud and unauthorized trading "result[s] solely out of

[RJO's] actions." *See BCS Ins. Co.*, 490 F.3d at 603 (stating "[t]he liability must be wholly

derivative, resulting solely out the agent's actions"). Accordingly, Plaintiff's claim for common

law indemnity should be dismissed because it fails to state a claim upon which relief can be

granted.

### C.    Plaintiff Fails To State A Claim For Contribution.

The Plaintiff's third claim for relief is entitled "Contribution." (Complaint ¶¶ 53-57).

> Where two or more persons are subject to liability in tort arising out of the same
> injury to person or property, or the same wrongful death, there is a right of
> contribution among them. The right of contribution exists only in favor of a
> tortfeasor who has paid more than his pro rata share of the common liability.

740 ILCS 100/2(a) and (b).

"In order to properly state a claim for contribution, the plaintiff in contribution must

allege that it and the defendant in contribution are both subject to liability in tort to the injured

party, and that the liability of the plaintiff and the defendant in contribution arises out of the

same injury." *Muirfield Village-Vernon Hill, LLC v. K. Reinke, Jr. and Company*, 810 N.E.2d

235, 245 (Ill. App. Ct. 2nd Dist. 2004). Plaintiff does not allege that it and RJO are both subject

to liability in tort to the injured party and that liability arises out of the same injury. Plaintiff's

liability is for its own fraud and unauthorized trading, specifically, fourteen unauthorized trades

it placed in the Nebraska farmers' accounts. This is not a tort; it is a violation of a federal statute

and federal regulations. (Complaint, Exhibit B ¶¶ 25, 32-36). Plaintiff, however, alleges that

RJO is the only liable party.  (Complaint ¶54).  This is completely opposite of an allegation of common liability which is required to state a claim for contribution.

Additionally, "the party seeking contribution must allege that he had paid in excess of his portion of liability." *Jannotta v. Kirkwood,* 702 F. Supp. 165, 168 (N.D. Ill. 1988).  Plaintiff does not allege that it paid in excess of his portion of liability.  Furthermore, the Plaintiff "must plead the amount it paid to the injured party." *Muirfield Village-Vernon Hill, LLC v. K. Reinke, Jr. and Company*, 810 N.E.2d 235, 245 (Ill. App. Ct. 2nd Dist. 2004).  Plaintiff does not allege the amount it paid to the injured party. Indeed, Plaintiff does not allege that it actually paid any restitution.  The claim for contribution should be dismissed because Plaintiff fails to plead common liability, payment in excess of portion of liability, and the amount it paid to the injured party.

### D.    Plaintiff Fails To State Claims For Fraudulent Misrepresentation and Negligent Misrepresentation.

#### 1.    Fraudulent Misrepresentation

Plaintiff's fourth claim for relief is entitled "Fraudulent Misrepresentation."  (Complaint ¶¶58-66).  The claim should be dismissed because Plaintiff does not and cannot allege (i) that RJO made a false statement or omission of material fact and (ii) an actual injury to Plaintiff resulting from the misstatement or omission.

Under Illinois law, the elements of fraudulent misrepresentation are:

[A] false statement or omission of material fact, which is made by defendant with the intent to deceive and induce the plaintiff to act, plus justifiable reliance by plaintiff on the false statement or omission, and an actual injury to plaintiff as a result of the misstatement or omission.

*Razdan v. General Motors Corp.*, 979 F.Supp. 755, 759 (N.D. Ill. 1997)(citation omitted).

First, Plaintiff does not and cannot allege that RJO made a false statement of material fact. *See Lillien v. Peak6 Investments, L.P.*, 417 F.3d 667, 671 (7th Cir. 2005) (stating "[f]raudulent misrepresentation claims require proof of a false statement about a material fact, and the false statement generally must relate to past or current facts, not promises or predictions about the future" (citation omitted)). Plaintiff alleges "RJO falsely represented that it would continue to accept the protective long put option positions that were part of Prime Trading's trading strategy since November 2002." (Complaint ¶58). This is an allegation of misrepresentation as to a future promise or intent which is insufficient under Illinois law to sustain an action for fraudulent misrepresentation. *LeDonne v. AXA Equitable Life Insurance Co.*, 411 F. Supp.2d 957, 960 (N.D. Ill. 2006) (stating "a misrepresentation as to a future promise or intent will not sustain an action for fraud" (citations omitted)).

Nor does the claim for fraudulent misrepresentation fit into the narrow exception for promises alleged to be part of a general scheme employed to accomplish the fraud. "A narrow exception exists where the 'promise is alleged to be part of a general scheme employed to accomplish the fraud.'" *LeDonne*, 411 F. Supp.2d at 960 (citations omitted); *see Houben v. Telular Corporation,* 231 F.3d 1066, 1074 (7th Cir. 2000). "To prevent the exception from swallowing the rule, bald assertions that the defendant never intended to keep a promise are 'insufficient to state a claim for promissory fraud.'" *LeDonne*, 411 F. Supp.2d at 960 (citations omitted). "Indeed, the burden of proof on a promissory fraud claim is 'deliberately high,' such that the plaintiff must plead 'specific, objective manifestations of fraudulent intent-a scheme or device.'" *Id.* at 960-61 (citation omitted).

Plaintiff does not allege "specific, objective manifestations of fraudulent intent-a scheme or device." *Id.* Thus, Plaintiff fails to allege a false statement of material fact or "promissory fraud."

The fraudulent misrepresentation claim should also be dismissed because Plaintiff fails to allege that Plaintiff's reliance led to ***Plaintiff's injury***. "A claim for fraudulent misrepresentation must allege 'that reliance by the person to whom the statement was made led to his injury.'" *Cangemi v. Advocate South Suburban Hospital*, 845 N.E.2d 792, 812 (Ill. App. Ct. 1st Dist. 2006) (citation omitted). Plaintiff alleges that if the Nebraska farmers suffered any losses they were the result of ***Plaintiff's reliance*** on the misrepresentations. (Complaint ¶86). This is not an allegation that reliance by the person to whom the statement was made led to his injury. Plaintiff has to allege either (i) Plaintiff's reliance led to Plaintiff's injury or (ii) the Nebraska farmers' reliance led to the Nebraska farmers' injury. There is simply no nexus between Plaintiff being held jointly and severally liable for restitution because of its alleged fraud and unauthorized trading and Plaintiff's alleged reliance on RJO allegedly promising to make trades.

The fraud claim should also be dismissed for failure to comply with Federal Rule of Civil Procedure 9(b). Fraud claims must be pleaded with particularity, and Plaintiff must allege "the who, what, where, and when of the alleged fraud." *Arnold v. Janssen,* 215 F. Supp.2d 951, 958 (N.D. Ill. 2002). "During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO meeting and the April 2003 Discussion" (Complaint ¶58) is not adequate to plead the fraud claim with particularity. A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6). *Thompson v. Columbia/HCA Healthcare Corp.*, 125

F.3d 899, 901 (5th Cir. 1997). Accordingly, the fraudulent misrepresentation claim should be dismissed.

Plaintiff's claim for fraudulent misrepresentation should be dismissed because Plaintiff does not and cannot allege (i) a false state of ***material fact***; (ii) the alleged promise is part of a general scheme employed to accomplish the fraud; (iii) Plaintiff's reliance led to Plaintiff's injury; and (iv) Plaintiff failed to plead the claim with particularity.

### 2.    Negligent Misrepresentation

Plaintiff's sixth claim for relief is entitled "Negligent Misrepresentation." (Complaint ¶¶ 77-89). The negligent misrepresentation claim should also be dismissed because, as discussed above, Plaintiff does not and cannot allege a false statement of material fact and damages resulting to Plaintiff from Plaintiff's reliance. In addition, the negligent misrepresentation claim should be dismissed because Plaintiff does not and cannot allege (i) RJO was carelessness or negligent in ascertaining the truth of the statement; (ii) RJO has a duty to communicate accurate information; or (iii) that RJO is in the business of supplying information for the guidance of others in their business transactions.

To state a claim for negligent misrepresentation, a plaintiff must allege:

> (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.

*First Midwest Bank, N.A. v. Stewart Title Guaranty Company*, 843 N.E.2d 327, 332 (Ill. 2006);

*Clark v. Experian Information Inc.,* 233 F.R.D. 508, 511 (N.D. Ill. 2005).

As discussed in Section I.D.1. *supra*, Plaintiff does not and cannot allege a false statement of material fact. Plaintiff alleges "RJO represented that it would continue to accept the

protective long put option positions." (Complaint ¶79). At best, Plaintiff alleges a misrepresentation as to a promise or intent to do something in the future. This is insufficient under Illinois law.

Plaintiff does not and cannot allege that RJO was carelessness or negligent in ascertaining the truth of the statement. Plaintiff must allege "carelessness or negligence in ascertaining the truth of the statement by defendant." *White & Brewer Trucking, Inc. v. Donley,* 952 F. Supp. 1306, 1316 (N.D. Ill. 1997). The court in *White* dismissed the negligent misrepresentation claim where plaintiff failed to make this allegation. *Id.* at 1317. Plaintiff cannot allege RJO was careless or negligent in ascertaining the truth of the statement because Plaintiff cannot allege that RJO made a false statement of material fact. Indeed, Plaintiff alleges that RJO, at best, made a future promise. Hence, RJO did not make a statement of fact whose truth could be ascertained.

Plaintiff does not and cannot allege that RJO had a duty to communicate accurate information. *See Clark,* 233 F.R.D. at 511 (stating that a duty to communicate accurate information is an element of negligent misrepresentation). Plaintiff also fails to allege that RJO was in the business of supplying information for the guidance of others in their business transactions. *See First Midwest Bank, N.A.,* 843 N.E.2d at 332 (stating where purely economic damages are sought, a party is under a duty to "avoid negligently conveying false information only if the party is in the business of supplying information for the guidance of others in their business transactions").

Plaintiff also fails to allege it has incurred damages resulting from its reliance. Plaintiff fails to allege that its reliance led to ***its injury***. Damage to the Plaintiff resulting from its reliance on the misrepresentation is an element of negligent misrepresentation. *See First Midwest Bank,*

*N.A.*, 843 N.E.2d at 332. Plaintiff alleges that if the Nebraska farmers suffered any losses they were the result of ***Plaintiff's reliance*** on the misrepresentations. (Complaint ¶86). Thus, Plaintiff is alleging that Nebraska farmers, who are not plaintiffs in this action, may have been injured. This is not an allegation that reliance by the person to whom the statement was made led to that same person's injury. There is simply no nexus between Plaintiff being held jointly and severally liable to the Nebraska farmers for Plaintiff's alleged fraud and unauthorized trading between April 2002 and March 2003 and RJO's alleged failure to accept orders on April 29, 2003.

Plaintiff's claim for fraudulent misrepresentation and negligent misrepresentation should be dismissed because Plaintiff fails to allege the elements of the claims.

### E.    Plaintiff Fails To State A Claim For Material Misrepresentation.

Plaintiff's fifth claim for relief is entitled "Material Misrepresentation." (Complaint ¶¶67-76). Plaintiff's claim for "Material Misrepresentation" should be dismissed for failure to state a legally cognizable cause of action. This fifth claim for relief is similar to the Fraudulent Misrepresentation and Negligent Misrepresentation claims, but this claim does not allege any mental state. Causes of action for misrepresentation "generally fall into two categories, fraudulent misrepresentation and negligent misrepresentation." *Roe v. Jewish Children's Bureau of Chicago*, 790 N.E.2d 882, 893 (Ill. App. Ct. 1st Dist. 2003). In *Powers v. Warner Bros. Records, Inc.,* 411 F. Supp. 747, 748 (N.D. Ill. 1976), the court dismissed the misrepresentation cause of action because the complaint did not contain any allegations as to the respects in which the defendant failed to exercise the required degree of care. The court noted "the pleading seems to have been drafted almost on a strict liability theory." *Id.* Thus, Plaintiff's claim for "Material Misrepresentation" should be dismissed for failure to state a legally cognizable cause of action.

Even if "Material Misrepresentation" were a legally cognizable cause of action, it should still be dismissed because Plaintiff fails to allege a misrepresentation. Plaintiff alleges "RJO made material representations to Volf that it would continue to accept the protective long put option positions." (Complaint ¶67). As discussed, in Section I.D., *supra*, this is not an allegation of a misrepresentation. It is at best an allegation of a future promise or intent to do something in the future which is insufficient.

### F.    Plaintiff Fails To State A Claim For Promissory Estoppel

Plaintiff's Seventh Claim is entitled "Promissory Estoppel." (Complaint ¶¶90-98). The Illinois Appellate Court has held that promissory estoppel is not a cause of action, rather it is a defense. *DeWitt v. Fleming*, 828 N.E.2d 756, 758 (Ill. App. Ct. 5th Dist. 2005). The court stated "promissory estoppel is available only as a defense (i.e., as a shield), not as a cause of action (i.e., as a sword)." *Id*. Because promissory estoppel is not a cause of action Plaintiff's claim for promissory estoppel should be dismissed.

Even if promissory estoppel were a viable cause of action, Plaintiff has failed to allege a claim for promissory estoppel. The elements are (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on the promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment. *Dumas v. Infinity Broadcasting Corporation*, 416 F.3d 671, 677 (7th Cir. 2005). "[A] claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking." *Id*. Where consideration is not an issue, promissory estoppel is not applicable. *Id*.

Plaintiff fails to allege that RJO made an unambiguous promise to Plaintiff. Plaintiff alleges "RJO represented that it would continue to accept the protective long option positions that were part of Prime Trading's trading strategy since November 2002." (Complaint ¶90).

This is not an allegation of a precise promise.  There are no allegations as to how long RJO was supposed to accept these trades or how many trades RJO was to accept.  Also, there are no allegations in the Complaint that consideration is lacking.  Thus, Plaintiff fails to allege the first element of a claim for promissory estoppel.  Plaintiff also fails to allege the third element that plaintiff's reliance was expected and foreseeable by defendant.  Lastly, the fourth element - that Plaintiff relied on the promise to their detriment is also lacking.

Thus, the claim for promissory estoppel should be dismissed because it is not a cause of action rather it is a defense and in any event Plaintiff does not and cannot allege the elements.

## CONCLUSION

For the foregoing reasons, defendant RJO, pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully requests the Court to dismiss the Complaint for failure to state a claim upon which relief can be granted.

Dated: March 21, 2008

Respectfully Submitted,

R.J. O'Brien & Associates, LLC

BY: s/ Doressia L. Hutton
       One of Its Attorneys

Vincent J. Connelly, 00501557
Doressia L. Hutton, 6275168
MAYER, BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
312-782-0600
312-701-7711

Marshall E. Hanbury
MAYER, BROWN LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101
202-263-3357
202-263-5357

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 21, 2008, I caused a copy of the Defendant's Brief In Support Of Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted to be served by electronic filing, upon the following counsel of record:

Edward H. Tricker
Woods & Aiken LLP
301 South 13th Street, Suite 500
Lincoln, Nebraska 68508

Jeffrey Schulman
Wolin & Rosen, Ltd.
55 West Monroe 36th Floor
Chicago, Illinois 60603


                                        <u>s/ Doressia L. Hutton</u>

**FILED**

**JANUARY 8, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**08 C 154**

| | | |
|---|---|---|
| PRIME TRADING COMPANY, INC., | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND DEMAND FOR JURY TRIAL** |
| R. J. O'BRIEN & ASSOCIATES, INC., an | ) | |
| Illinois Corporation, | ) | |
| | ) | **JUDGE KENNELLY** |
| Defendant. | ) | **MAGISTRATE JUDGE ASHMAN** |

Plaintiff, Prime Trading Company, Inc., for its Complaint against R. J. O'Brien & Associates, Inc. states and alleges as follows:

### STATEMENT OF PARTIES

1.  Plaintiff Prime Trading Company, Inc. ("Prime Trading"), is a Nebraska corporation with its principal place of business in Nebraska.

2.  Defendant, R. J. O'Brien & Associates, Inc. ("RJO"), is an Illinois corporation engaged in business as a commodities broker and futures commission merchant whose principal place of business is in Chicago, Cook County, Illinois.

### JURISDICTION AND VENUE

3.  This is a civil action in which the Court has jurisdiction, pursuant to 28 U.S.C. § 1332(a), in that the Plaintiff and Defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.


EXHIBIT
1

4.    Venue is appropriate under 28 U.S.C. § 1391(a)(1) and (c) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Defendant is subject to personal jurisdiction in this District.

### General Allegations

5.    This Complaint arises out of the same series of transactions as alleged in the Commodities Futures Trading Commission's ("CFTC") First Amended Complaint for Injunctive and Other Equitable Relief and For a Civil Monetary Penalty ("CFTC Complaint) which the CFTC filed against Plaintiff and others ("CFTC Lawsuit"), a true and correct copy of which is attached hereto as Exhibit A.

6.    Without admitting any of the allegations in the CFTC Complaint or in the CFTC Lawsuit, and expressly reserving all of the denials which have been or may hereafter be asserted, this Complaint refers to, and incorporates herein by reference, the allegations set forth in the CFTC Complaint.

7.    The CFTC Complaint alleges that Plaintiff and others engaged in acts and practices in violation of various provisions of the Commodity Exchange Act, 7 U.S.C. § 1 et seq. ("Act") and the regulations promulgated thereunder, 17 C.F.R. § 1 et seq. ("Regulations").

8.    The CFTC Complaint alleges that between April 2002 through at least March 2003, Plaintiff and others committed fraud and executed unauthorized trades in numerous customers' commodity accounts in violation of various provisions of the Act and Regulations. The CFTC Complaint alleges that the Nebraska farmers that were customers (the "Prime Customers") of Prime Trading lost approximately Five Million One Hundred Thousand Dollars ($5,100,000.00) as a result of the alleged violations. The CFTC Complaint seeks an order

00254120

directing Plaintiff and others to make "full restitution" to every Prime Customer who lost money as a result of the alleged wrongful conduct.

9.     On or about December 17, 2007, a Consent Order of Permanent Injunction and Other Equitable Relief was issued in the CFTC Lawsuit ("Consent Order") finding that Plaintiff and others are jointly and severally liable to pay restitution in the amount of $325,000 to 57 Prime Customers.  A true and correct copy of the Consent Order is attached hereto as Exhibit B.

10.     Plaintiff's liability for the $325,000 in restitution is derived from or concurrent with the acts, failure to act and liability of RJO.

11.     In addition to the claims asserted by the CFTC in the CFTC Complaint, certain Prime Customers have also asserted restitution and other claims against Plaintiff and others regarding losses which the customers allegedly suffered in their accounts with Prime Trading, and some of those Prime Customers filed lawsuits against Plaintiff and others ("Prime Customer Lawsuits").

12.     Plaintiff has denied that it was in any manner responsible for the alleged injuries and damages suffered by the Prime Customers.  If, however, any liability is imposed on Plaintiff as a result of the matters alleged and/or asserted by Prime Customers, that liability could only be derived from or concurrent with the acts, failure to act and liability of RJO.

### Prime Trading Trades
### Commodities Futures on Behalf of Farmers

13.     In or about 1999, Prime Trading began offering commodities brokerage services in Sherman County, Nebraska.  As part of Prime Trading's business in Sherman County, Prime Trading bought and sold options, known as "puts" and "calls," on commodities futures contracts.

14.     Farmers in and around Loup City, Nebraska, and in Kansas authorized Prime Trading to purchase and sell options on commodities futures contracts, thereby becoming customers of Prime Trading.

15.     Prime Trading was a guaranteed broker of certain futures commission merchants ("FCM") whose role was to accept funds from customers and fill orders at the commodities exchange.

16.     At all relevant times, Lawrence Joseph Volf ("Volf") was listed as a principal and registered as an "associated person" of Prime Trading and was the President of Prime Trading.

17.     From 1999 through March 2002, Prime Trading used E.D. & F. Man International, Inc. ("Man") as its FCM.

18.     At the end of March 2002, Prime Trading bulk transferred the accounts from Man to RJO and Man assigned its customer accounts to RJO at that time.

### The 2002 Trading Program

19.     In the Spring of 2002, Volf and Lawrence Baker, an independent contractor associated with Prime Trading ("Baker"), began enrolling customers for participation in Prime Trading's 2002 marketing program (the "2002 Trading Program").

20.     The 2002 Trading Program involved a combination of strategies, including marketing the 2002 crops to be grown and also re-establishing the ownership of 2001 crops that had been previously sold in cash markets via long futures and/or call options strategies. Another strategy of the 2002 Trading Program was to utilize government farm subsidy payments to enhance overall farm income potential by either protecting against potential loss of these government payments and/or relying on them to offset potential losses in futures and/or options positions established in the customers' trading accounts.

21.    From April 2002 through July 2003, as part of the 2002 Trading Program, Prime Trading was authorized by the Prime Customers to buy and sell numerous "put" and "call" options on futures contracts to accomplish the objectives of the 2002 Trading Program.

22.    At the end of November 2002, it was determined that the existing protective long December put option positions held by the Prime Customers needed to be rolled forward into protective long March put option positions. RJO accepted the orders to roll forward the protective long December put option positions without dispute or any further requirements and despite outstanding and unpaid customer margin calls. RJO agreed that any outstanding and unpaid customer margin calls could be paid after the protective long December put option positions were rolled forward into protective long March put option positions. The protective long December put options which were rolled forward were set to expire on approximately November 20, 2006. All outstanding and unpaid customer margin calls were subsequently paid after the protective long December put option positions were rolled forward into protective long March put option positions.

23.    The basis of the 2002 Trading Program at the end of November 2002 was to maintain long futures while maintaining protective long "put" option positions. The trading strategy was to maintain this position until the corn futures market rallied approximately 25 cents per bushel. The trading strategy required expiring protective put options positions to be "rolled forward" to another contract month until the approximately 25 cents per bushel price rally took place in the corn futures market.

24.    At customer meetings held on December 2, 3 and 4, 2002 (the "December Customer Meetings"), Volf explained to customers participating in the 2002 Trading Program that certain set backs had been incurred in the Program.

00254120

- 5 -

25.     During the December Customer Meetings Volf described the nature of the set backs as well as what the 2002 Trading Program strategy would be from that point forward. Volf also informed the customers that they could either stay with the 2002 Trading Program, albeit at a risk of future losses, or that they could discontinue trading in the 2002 Trading Program immediately.  All but one customer chose to remain in the 2002 Trading Program.

26.     On or about December 13, of 2002, Volf traveled to Chicago to meet with representatives of RJO to explain the 2002 Trading Program and discuss the timely payment of customer margin calls (the "December RJO Meeting").  At this meeting, RJO representatives told Volf that they wanted Prime Trading to "re-paper" all of the accounts that Man had assigned to RJO.  RJO required the following documentation from Prime Customers:  (a) risk disclosures, (b) RJO account agreements, (c) a power of attorney giving Volf absolute authority over customer accounts, (d) new security agreements, and (e) position ratification statements.  RJO stated that it would be willing to continue to accept orders to facilitate the execution of the 2002 Trading Program after customers executed the aforementioned documentation.  Pursuant to RJO's requirement and upon request by Prime Trading, nearly all of the Prime Customers executed the above-listed documents.

27.     At the December RJO Meeting, Volf described in detail for RJO the future trading strategies for the 2002 Trading Program, including the use of long corn futures and protective long put option positions to help mitigate the risk of the long corn futures.  These positions considered together are what are commonly referred to as "synthetic call options."  Volf also informed RJO that one component of the strategy included capturing extrinsic (time) values from short call and put option positions.  RJO was also informed that if the strategy did not come to fruition prior to the time the protective put options were set to expire, the protective put options

would be rolled forward to give the strategy additional time to come to fruition. Volf explained to RJO that corn prices needed to increase approximately 25 cents per bushel for this particular strategy to come to fruition. RJO stated that it would allow Prime Trading to proceed with its strategy and that RJO would accept orders on behalf of the Prime Customers to accomplish the strategy as described by Volf.

28.     Prior to and after the December RJO Meeting and the December Customer Meetings, Volf and Baker explained to Prime Customers that some of the strategies used in the 2002 Trading Program could potentially generate large margin calls and that customers would need to have financial arrangements made in advance to cover those margin calls.

29.     Accordingly, the majority of Prime Customers asked the Sherman County Bank and/or other banks (collectively the "Lenders") to provide credit to cover the potential margin calls, and the Lenders agreed to provide that credit. In January 2002, RJO requested that the Lenders and the customer execute a Security Agreement and Assignment of Account ("Security Agreement") with regard to each of the customers obtaining such credit. The Security Agreement allowed the Lenders to fund margin calls on behalf of the customers in return for a security interest in the customers' RJO accounts. A true and correct copy of a representative example of a Security Agreement is attached as Exhibit C and is incorporated herein by this reference.

30.     Under the Security Agreements, RJO incurred certain duties and obligations, including an obligation to notify the Lenders of any outstanding margin call that might threaten the Lenders' security interests in the customers' accounts. RJO was to give the Lenders a reasonable opportunity to meet the margin call so as to protect the Lenders' security interests.

00254120

31.    At the end of February 2003, it was once again determined by Volf that to carry out the 2002 Trading Program strategy as presented in the December RJO Meeting and the December Customer Meetings, the existing protective long March put option positions needed to be rolled forward into protective long May put option positions. RJO again accepted the orders to roll forward the protective long March put option positions without dispute or any further requirement and despite outstanding and unpaid customer margin calls. RJO agreed that any outstanding and unpaid customer margin calls could be paid after the protective long March put option positions were rolled forward into protective long May put option positions. The protective long March put option positions which were rolled forward were set to expire on approximately February 20, 2003. All outstanding and unpaid customer margin calls were subsequently paid after the protective long March put option positions were rolled forward into protective long May put option positions.

32.    On or about April 24, 2003, many of the Prime Customers received a margin call from RJO. A large number of these margin calls were first day margin calls; however, a few of the Prime Customers had extended margin calls.

33.    On or about April 24, 2003, Volf discussed with RJO the need to again roll positions forward, as the protective long May put options were about to expire. Volf and RJO discussed the outstanding margins calls then in existence and Volf requested that RJO allow the Prime Customers to pay the margin calls after the positions were rolled forward in the same manner as the margin calls had been paid in November of 2002 and February of 2003. A representative of RJO informed Volf that it would be acceptable to RJO if the Prime Customers paid the margin calls after the positions were rolled forward (the "April 2003 Discussion"). All outstanding and unpaid customer margin calls were subsequently paid.

00254120

## RJO Refuses to Process Customer Orders
## After Bank Offers to Cover Outstanding Margin Calls

34.    On April 29, 2003, Prime Trading began entering orders to roll the positions forward pursuant to the strategy that was discussed with the Prime Customers during the December Customer Meetings and RJO during the December RJO Meeting and during the April 2003 Discussion. After some of the protective orders were accepted and filled by RJO on April 29, 2003, a floor trader for the first time informed Volf that RJO would not accept any more of the protective orders from Prime Trading.

35.    In response to the floor trader's unexpected refusal to accept the protective orders from Prime Trading, Volf immediately called Mike O'Malley ("O'Malley"), an employee/representative of RJO, to find out the reason the protective orders were not being accepted. O'Malley informed Volf that the protective orders were not being accepted because of outstanding customer margin calls.

36.    After speaking with O'Malley, Volf immediately called Jerry Wortman, the President of the Sherman County Bank ("Wortman"), and informed him of the situation. Volf, Wortman and Baker called O'Malley on April 29, 2003. During this phone conversation, O'Malley again stated that RJO would not accept any more protective orders from Prime Trading due to outstanding customer margin calls. In response to O'Malley's comment, Wortman informed O'Malley that the Sherman County Bank would wire an amount of funds sufficient to cover the outstanding margin calls within the hour. O'Malley told Wortman that even if the funds were sent, RJO would continue to refuse orders from Prime Trading. O'Malley failed and refused on behalf of RJO, to provide any further explanation for RJO's unexpected refusal to accept additional protective orders from Prime Trading.

00254120

37.    As a direct consequence of RJO's refusal to accept the orders to establish protective positions, the risk exposure to all of the Prime Customers was substantially increased. Further, as this was not a risk that any of the Prime Customers agreed to take, Prime Trading was forced by RJO and had no alternative but to immediately liquidate all of the remaining unprotected long futures positions before the corn futures market rallied and met the goal of an approximate 25 cent per bushel increase. Accordingly, all of the remaining unprotected long futures positions were liquidated. In addition, RJO also required Prime Trading to liquidate certain short option positions as well. Such liquidations were completed by not later than April 29, 2003.

38.    Because RJO refused to let the Lenders protect the Prime Customers' investments by making the outstanding margin calls, the Prime Customers were forced by RJO to abandon the remaining unprotected positions. Had RJO honored and fulfilled its promises and agreements as it had done previously and as it had repeatedly advised Volf that it would do, the Prime Customers would have been able to stay with their positions and they would have met the stated objectives of the 2002 Trading Program within 10 days following April 29, 2003.

39.    Any damages allegedly suffered by the Prime Customers are a proximate result of RJO's wrongful, improper, arbitrary and capricious refusal to accept orders from Prime Trading on April 29, 2003, and the resulting forced liquidation of the Prime Customers' accounts.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT

For its First Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

40.    Plaintiff was a third-party beneficiary to the Security Agreement.

00254120

- 10 -

41.    All conditions precedent to the bringing of this action have been performed by Plaintiff and/or excused or waived by the actions or inactions of RJO.

42.    RJO breached the Security Agreement, acted in bad faith, engaged in willful misconduct, and was grossly negligent when it refused to accept the protective orders on April 29, 2003.

43.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts with respect to the 2002 Trading Program.

44.    To the extent the Prime Customers suffered any losses in their commodity accounts as aforesaid, those losses were the proximate result of RJO's breaches of the Security Agreement.

45.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, RJO's breach of the Security Agreement, and RJO's acts of bad faith, misconduct and negligence.

46.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of RJO's breaches of the Security Agreement.

47.    Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by RJO's breach of the Security Agreement, and RJO's acts of bad faith, misconduct and negligence.

00254120

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its First Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## SECOND CLAIM FOR RELIEF
## COMMON LAW INDEMNITY

For its Second Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

48.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

49.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the acts or omissions of RJO, including but not limited to, RJO's refusal to accept the protective orders from Prime Trading on April 29, 2003.

50.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and negligence, which in justice, should be paid by RJO.

51.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is

liable to Plaintiff for any restitution payments as a result of the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and negligence, which in justice, should be paid by RJO.

52.    Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits which fees and costs were proximately caused by RJO's acts and omissions, including but not limited to, RJO's acts of bad faith, misconduct and negligence, which in justice, should be paid by RJO.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Second Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## THIRD CLAIM FOR RELIEF
### CONTRIBUTION

For its Third Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

53.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

54.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the acts or omissions of RJO, including but not limited to, RJO's failure and refusal to accept the protective orders on April 29, 2003.

00254120

55.     Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and negligence.

56.     If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and negligence.

57.     Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and negligence.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Third Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## FOURTH CLAIM FOR RELIEF
## FRAUDULENT MISREPRESENTATION

For its Fourth Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

00254120

58.    During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO falsely represented that it would continue to accept the protective long put option positions that were part of Prime Trading's trading strategy since November 2002.

59.    Upon information and belief, when RJO made these representations, the representations were false and, in fact, on April 29, 2003, RJO refused to accept the protective orders from Prime Trading.

60.    The misrepresentations made by RJO were made with the intention that Plaintiff should rely on the representations.

61.    Plaintiff reasonably relied on RJO's representations and Plaintiff refrained from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

62.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses that the Prime Customers allegedly sustained in their commodity accounts.

63.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the Plaintiff's reasonable reliance on the misrepresentations made by RJO.

64.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, Plaintiff's reasonable reliance on the misrepresentations made by RJO.

65.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is

00254120

- 15 -

liable to Plaintiff for any restitution payments as a result of Plaintiff's reasonable reliance on the misrepresentations made by RJO.

66.     Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by Plaintiff's reasonable reliance on the misrepresentations made by RJO.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Fourth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## FIFTH CLAIM FOR RELIEF
## MATERIAL MISREPRESENTATION

For its Fifth Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

67.     During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO made material representations to Volf that it would continue to accept the protective long put option positions that were part of Prime Trading's trading strategy since November 2002.

68.     Upon information and belief, the material representations made by RJO to Volf were made with the intention that Plaintiff would rely on the representations.

00254120

69.    Upon information and belief, when RJO made the material representations to Volf, they were false and, in fact, on April 29, 2003, RJO refused to accept the protective orders.

70.    The material misrepresentations caused Plaintiff to refrain from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

71.    Plaintiff's reliance on the material misrepresentations was reasonable.

72.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

73.    To the Extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of Plaintiff's reliance on the material misrepresentations made by RJO.

74.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, Plaintiff's reliance on the material misrepresentations made by RJO.

75.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of Plaintiff's reliance on the material misrepresentations made by RJO.

76.    Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by Plaintiff's reliance on the material misrepresentations made by RJO.

00254120

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Fifth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## SIXTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

For its Sixth Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

77.    At all times relevant hereto, Plaintiff was engaged in business relating to the providing of brokerage services and had a pecuniary interest in the business transactions that are the subject matter of this action.

78.    At all times relevant hereto, Plaintiff was relying upon and looking to RJO for guidance as to RJO's particular knowledge, expertise and skill in connection with the placing of positions in the commodities market.

79.    During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO represented that it would continue to accept the protective long put option positions which were part of Prime Trading's trading strategy for the 2002 Trading Program since November 2002.

80.    Upon information and belief, RJO made these representations for the benefit and guidance of Plaintiff in its business transactions relating to the 2002 Trading Program.

00254120

- 18 -

81.    Upon information and belief, RJO made these representations with the intention or knowledge that the representations would influence Plaintiff's business transactions relating to the 2002 Trading Program.

82.    Plaintiff reasonably relied on RJO's representations and Plaintiff refrained from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

83.    RJO failed to exercise reasonable care or competence in making the representations to Plaintiff.

84.    The representations that RJO made were false and, in fact, on April 29, 2003, RJO refused to accept the protective orders.

85.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

86.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of Plaintiff's reliance on the misrepresentations made by RJO.

87.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, Plaintiff's reliance on the misrepresentations made by RJO.

88.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of Plaintiff's reliance on the misrepresentations made by RJO.

00254120

89.     Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by Plaintiff's reliance on the misrepresentations made by RJO.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Sixth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

### SEVENTH CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL – DETRIMENTAL RELIANCE

For its Seventh Claim for Relief, Plaintiff incorporates paragraphs 1 through 39 of this Complaint as if fully set forth herein.

90.     During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO represented that it would continue to accept the protective long put option positions that were part of Prime Trading's trading strategy since November 2002.

91.     Upon information and belief, RJO made these representations with the intention or knowledge that the representations would influence Plaintiff's business transactions relating to the 2002 Trading Program.

00254120

92.    Plaintiff reasonably relied on RJO's representations and Plaintiff refrained from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

93.    Plaintiff was unaware that RJO would not accept the protective orders that Prime Trading attempted to place on April 29, 2003 and, in fact, RJO's previous actions and statements affirmatively evidence that such protective orders would be accepted by RJO.

94.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses that the Prime Customers allegedly sustained in their commodity accounts.

95.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of Plaintiff's reliance on the misrepresentations made by RJO.

96.    Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order is derived from, and proximately caused by, Plaintiff's reliance on the misrepresentations made by RJO.

97.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of Plaintiff's reliance on the misrepresentations made by RJO.

98.    Plaintiff is jointly and severally liable for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits which fees and costs were proximately caused by Plaintiff's reliance on the misrepresentations made by RJO.

00254120

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Seventh Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $325,000 in restitution ordered under the Consent Order, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for more than $600,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, Prime Trading Company, Inc., hereby demands a trial by jury to be held in the Northern District of Illinois, Eastern Division, in this matter.


Dated this 8th day of January, 2008.


PRIME TRADING COMPANY, INC., Plaintiff


By    s/Edward H. Tricker
      Edward H. Tricker, Neb. No. 15504
      Attorney for Plaintiff
      WOODS & AITKEN LLP
      301 South 13th Street, Suite 500
      Lincoln, Nebraska 68508
      Telephone: 402-437-8500
      Facsimile: 402-437-8558
      etricker@woodsaitken.com

      and

Jeffrey Schulman, No. 2513080
Attorney for Plaintiff
WOLIN & ROSEN, LTD.
55 West Monroe, 36th Floor
Chicago, Illinois 60603
Telephone: 312-424-0600
Facsimile: 312-424-0660
jschulman@wolinlaw.com

00254120

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| COMMODITY FUTURES | : | |
| TRADING COMMISSION | : | CIVIL ACTION NO.: 4:04CV3184 |
| | : | |
| Plaintiff, | : | |
| | : | **FIRST AMENDED COMPLAINT** |
| v. | : | **FOR INJUNCTIVE AND OTHER** |
| | : | **EQUITABLE RELIEF AND FOR A** |
| Commercial Hedge Services, Inc. | : | **CIVIL MONETARY PENALTY** |
| d.b.a. Prime Trading Company, | : | |
| Prime Trading Company, Inc., | : | |
| Lawrence Joseph Volf, | : | |
| PT Holdings, Inc. d.b.a. Prime Trading, | : | |
| Sherman County Management, Inc., | : | |
| and Sherman County Bank | : | |
| | : | |
| Defendants. | : | |

COMES NOW the Commodity Futures Trading Commission ("Commission"), by

counsel, and for its First Amended Complaint alleges as follows:

### SUMMARY

1.      As is more fully set forth and alleged below, defendants Commercial Hedge Services,

Inc. ("CHS"), Prime Trading Company, Inc. ("Prime Trading"), Lawrence Joseph Volf ("Volf"),

PT Holdings, Inc. ("PT Holdings"), Sherman County Management, Inc. ("Management

Company"), and Sherman County Bank ("Bank") have engaged in acts and practices that

constitute violations of the Commodity Exchange Act, as amended ("the Act"), 7 U.S.C. §§ 1 *et*

*seq.* (2002) and the Commission Regulations ("Regulations") §§ 1.1 *et seq.* (2004).

2.      Beginning in approximately April 2002 through at least March 2003 ("the relevant

period"), defendants Volf, Prime Trading, and CHS committed fraud and executed unauthorized



EXHIBIT

*A*

trades in more than 80 Nebraska farmers' commodity futures hedge accounts in violation of Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b), and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2.

3.     Prime Trading was a non-bank subsidiary of the Management Company and provided commodity trading advice for the purpose of assisting the bank and bank customers.

4.     The farmers opened hedge accounts to protect themselves from a decrease in the price of their corn crops. Despite the fact that the farmers' account opening documents clearly indicated that the accounts were hedge accounts, to be used only for the purpose of executing bona fide hedge transactions, Volf, Prime Trading, and CHS executed speculative trades that the farmers did not authorize. During most of the months in question defendants Volf, Prime Trading, and CHS, without the farmers' authorization, fraudulently initiated overall long positions that increased the farmers' risk should there be a decrease in the price of corn. Volf, Prime Trading, and CHS disregarded the hedge agreements in the farmers' account opening documents and executed unauthorized speculative trades that ultimately caused the farmers to lose approximately $5.1 million.

5.     Moreover, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that they were hedging their corn crop, in particular, that they were decreasing their risk should there be a fall in the price of corn. In reality, however, defendants Volf, Prime Trading, and CHS executed a trading strategy that consistently increased the farmers' price risk.

6.     During the relevant period, defendant Bank willfully aided and abetted defendants Volf, Prime Trading, and CHS in committing fraud and unauthorized trading, and therefore is liable for that fraud and unauthorized trading pursuant to Section 13(a) of the Act, 7 U.S.C. § 13(c).

7.    During the relevant period, defendant Bank was a principal, and defendant Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud and unauthorized trading committed by defendant Volf.

8.    During the relevant period, defendant Management Company was a principal, and defendant Prime Trading was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud and unauthorized trading committed by defendant Prime Trading.

9.    At or about the time the Commission first filed its Complaint against defendants Volf, Prime Trading, and CHS, Prime Trading essentially changed its name to PT Holdings. PT Holdings became a continuation of, and successor corporation to Prime Trading and is therefore liable for Prime Trading's fraud and unauthorized trading.

10.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations. In addition, the Commission seeks civil monetary penalties, restitution to farmers for losses caused by defendants' fraud, disgorgement of defendants' ill-gotten gains, a trading prohibition and such other relief as this Court may deem necessary or appropriate.

11.    Unless restrained and enjoined by this Court, defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## JURISDICTION AND VENUE

12.    This Court possesses jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person

3

has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper District Court of the United States against such person to enjoin such practice or to enforce compliance with the Act.

13.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because defendants are found in, inhabit, or transact business in the District of Nebraska, and the acts and practices in violation of the Act have occurred within this District, among other places.

## THE PARTIES

14.     **Plaintiff Commodity Futures Trading Commission** is the independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et. seq*, as amended, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et. seq*. The Commission's main office is located at 1155 21st Street, NW, Washington, DC 20581.

15.     **Defendant Commercial Hedge Services, Inc.** is a Nebraska corporation and is currently registered with the Commission as an Introducing Broker ("IB") and with the Securities and Exchange Commission as Notice Broker Dealer. CHS is guaranteed by R. J. O'Brien & Associates Inc. ("R.J. O'Brien), a Futures Commission Merchant ("FCM") registered with the Commission. CHS has offices at 1510 E. 4th Street, Suite 1, North Platte, Nebraska  69101.

16.     **Defendant Prime Trading Company, Inc.** is a Nebraska corporation and was operated as a branch office of CHS. During the relevant period, Sherman County  Management, Inc. and Lawrence Joseph Volf each owned  a fifty percent (50%) interest in Prime Trading. Prime Trading has offices at 717 O Street, Loup City, Nebraska 68853.

17.    **Defendant Lawrence Joseph Volf** resides at 1120 West 4th Street, North Platte, Nebraska 69101. Volf has been listed as a principal and registered as an Associated Person ("AP") of CHS since 1988, and registered as a Branch Manager of CHS since 1999. Volf is listed as a principal and registered as an AP of Prime Trading, a subsidiary of the Management Company and an affiliate of the Bank.

18.    **Defendant PT Holdings, Inc.** is a Nebraska corporation and does business as Prime Trading. PT Holdings is the successor corporation of Prime Trading and is currently registered as an independent IB. PT Holdings is located at 717 O Street, Loup City, Nebraska, the former office of Prime Trading.

19.    **Defendant Sherman County Management, Inc.** is a single bank financial holding company located in Loup City, Nebraska. The Management Company currently owns 100 percent of the Bank, and owned a 50 percent (50%) interest in Prime Trading from approximately January 2000 through approximately June 2004. The Management Company is listed with the Commission as a principal of Prime Trading.

20.    **Defendant Sherman County Bank** is a state chartered bank with its principal place of business at 734 O Street, Loup City, Nebraska. The Bank is insured by the Federal Deposit Insurance Corporation and is wholly owned by the Management Company.

## FACTUAL BACKGROUND

### A.    The Relationship Between Volf, Prime Trading, the Management Company, and the Bank

21.    During the relevant period, the Bank serviced mainly agricultural customers and some small businesses. The bulk of the Bank's agricultural customers raised mainly corn and livestock.

5

22.    During the relevant period, the Bank provided operating loans to most of its agricultural customers.

23.    During the relevant period, Gerald Wortman ("Wortman") was an employee of the Bank; served as the Bank's president; was a loan officer at the Bank; and sat on the board of directors of the Bank, the Management Company, and Prime Trading.

24.    During the relevant period, George McFadden ("McFadden") was an employee of the Bank; served as the Bank's senior vice president; was a loan officer at the Bank; and sat on the board of directors of the Bank, the Management Company, and Prime Trading.

25.    During the relevant period, Volf was an employee of the Bank, served as the Bank's vice president, was a loan officer at the Bank, was an employee of Prime Trading, served as the president of Prime Trading, owned a fifty percent (50%) interest in Prime Trading, and sat on the board of directors of Prime Trading and the Bank.  As such, Volf was an agent of Prime Trading and an agent of the Bank.

26.    In or about 1999, Wortman, McFadden, and possibly other Bank employees, determined that the Bank's agricultural loan customers, in particular those that raised corn, were not achieving the best returns on their crops and, therefore, were not fully maximizing their yearly income.

27.    Wortman, McFadden, and possibly other Bank employees, believed that if their agricultural loan customers (and other customers) achieved higher returns on their crops, their customers' wealth would increase.  They believed that if their customers' wealth increased, then in turn, the wealth and security of the Bank would increase.

28.   To address these issues, Wortman, McFadden, and possibly other Bank employees, determined that the Bank customers needed agricultural commodity trading services so they could access and benefit from the futures market.

29.   As a result, Wortman consulted Volf, a Bank employee and agent, with the specific purpose of discussing the establishment of an agricultural commodity trading program for the Bank's customers. Wortman knew that Volf had prior commodity trading experience and that Volf had been associated with CHS since 1988.

30.   As a result of his meeting(s) with Volf, Wortman, and possibly other Bank employees, determined that the Bank would seek to provide commodity trading services to its agricultural customers. Banking regulations, however, prohibited the Bank from directly providing such services to its customers. Banking regulations did allow the Management Company (the Bank's parent company) to operate a non-bank subsidiary to provide such services to Bank customers.

31.   As a result of the regulatory restraints, the Bank consulted the Management Company about acquiring a commodity trading firm as a non-bank subsidiary for the purpose of assisting the Bank's agricultural customers. The board of directors of the Management Company, which included Wortman and McFadden, agreed to the acquisition of a fifty percent (50%) interest in Prime Trading.

32.   On or about December 28, 1999, Volf incorporated Prime Trading. Pursuant to an agreement with the Management Company, Volf transferred a fifty percent (50%) interest in Prime Trading to the Management Company in exchange for Management Company issuing Volf twenty-two (22) shares of the Management Company's stock.

33.     After the stock transfer which gave the Management Company a fifty percent (50%) interest in Prime Trading, the Management Company subsequently listed itself with the Commission as a principal of Prime Trading and held Prime Trading as a non-bank subsidiary.

34.     Prime Trading formed a board of directors that included Wortman, McFadden, and Volf.

35.     A portion of each meeting of the Management Company's board of directors was typically devoted to issues relating to Prime Trading, and Volf often appeared at these meetings to provide information about Prime Trading and to discuss Prime Trading issues.  Wortman also advised the Management Company's board of directors regarding issues and developments surrounding Prime Trading.

36.     At the time the Management Company acquired a fifty percent (50%) interest in Prime Trading, Prime Trading did not have any customers.

37.     In order to get customers for Prime Trading, the Bank, through its agents (including but not limited to Wortman, McFadden, and Volf), all acting in their capacity as agents of the Bank, identified and selected Bank agricultural customers that they believed should participate in Prime Trading's agricultural commodity trading program (the "Program").

38.     After Wortman, McFadden, Volf (and possibly other Bank officials and employees) identified the Bank customers they believed would benefit from the services offered by Prime Trading, Wortman invited those Bank customers to attend a meeting with Volf and, in some cases, suggested to bank customers that they open commodity trading accounts with Prime Trading.

39.     During the relevant period, Bank loan officers, including but not limited to Volf, acting in their capacity as agents of the Bank, and in furtherance of that agency, solicited Bank agricultural customers (and potential Bank customers) to open commodity trading accounts with

8

Prime Trading. For example, one individual (not a previous Bank customer) came to the Bank to apply for a home mortgage loan. Bank employees discussed the home mortgage with him, then told this home mortgage customer that he should participate in Prime Trading's commodity trading program, and referred him to Volf to open a hedge account with Prime Trading.

40.    Prime Trading ultimately developed the Program for the Bank's customers. Bank customers solicited into the Program by Bank directors, officers, and employees signed hedge agreements and initially opened accounts with E.D. and F. Man as the FCM. Those accounts were subsequently transferred to a new FCM, R.J. O'Brien.

41.    Prime Trading held approximately four meetings per year regarding the Program during which Volf explained the status of the market for corn and potential trading strategies for protecting Program participants from a fall in the price of their crops, in particular, corn.

42.    Wortman encouraged his loan officers to attend such meetings so they could be knowledgeable about the Program and so they could discuss the Program with the Bank's loan customers.

43.    The meetings were generally scheduled without much advance notice and, of the more than 80 Program participants, between 20 and 50 attended. Wortman and McFadden attended most, if not all, of these meetings.

44.    Volf informed Program participants and potential Program participants at his meetings that if Prime Trading customers were also customers of the Bank, the Bank would cover their margin calls, "no questions asked."

**B.    Trading Activity in the Program Participants' Hedge Accounts**

45.    Shortly after the Management Company acquired its interest in Prime Trading, Bank customers began to set up non-discretionary hedge accounts with Prime Trading. Pursuant to those hedge agreements, Prime Trading began to enter into trades on behalf of the customers.

46.    As part of the Program, from approximately April 2002 through at least March 2003, defendants Volf, Prime Trading, and CHS traded in non-discretionary hedge accounts for more than 80 farmers located in and around Sherman County, Nebraska. The trades were executed by R.J. O'Brien. Volf did so in his capacity as an agent of Prime Trading and the Bank, and in furtherance of those agency relationships.

47.    The farmers produced corn and, therefore, were long the cash corn market. In order to protect against price fluctuations in the corn market, each farmer's hedge account was only to be used for the purpose of executing bona fide hedge transactions.

48.    During the meetings regarding the Program, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that they were hedging on the farmers' behalf, when, in fact, they were actually speculating. In particular, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that their exposure to price risk would be decreased when, in fact, defendants' trading strategy consistently increased the farmers' price risk.

49.    Defendants Volf, Prime Trading, and CHS executed trades for or on behalf of the farmers, placed batch orders for those trades, and allocated the executed trades on a pro-rated basis among the hedge accounts.

50.    Defendants Volf, Prime Trading, and CHS primarily traded in options on futures contracts, which they occasionally exercised, resulting in the assignment of futures contracts to the hedge accounts. On occasion, they also purchased futures contracts.

10

51.    The farmers' hedge accounts were traded in a fraudulent manner not authorized by their owners. The farmers' purpose in engaging the services of defendants was to hedge the farmers' corn crops. The farmers never requested nor authorized defendants Volf, Prime Trading, and CHS to make speculative trades in their accounts. The farmers never requested nor authorized defendants to increase their net long positions.

52.    Defendants Volf, Prime Trading, and CHS did not, prior to the purchase or sale, tell each farmer the precise commodity interest or the exact amount of the commodity interest that they were going to buy or sell for the farmer.

53.    Prior to the purchase or sale, defendants Volf, Prime Trading, and CHS did not obtain from each farmer the precise commodity interest or the exact amount of the commodity interest that the farmer wished to buy or sell for his hedge account.

### C.    The On-Going Fraud and Unauthorized Trading

54.    From April 2002 through at least March 2003, rather than reducing the farmers' price risk, defendants Volf, Prime Trading, and CHS fraudulently initiated net long positions in the hedge accounts that increased the farmers' downward price risk in nine of the twelve months of trading. Moreover, defendants Volf, Prime Trading, and CHS fraudulently initiated positions in the hedge accounts – by purchasing futures contracts and buying and selling puts and calls (options) – that resulted in net long positions, thereby increasing the farmers' price risk.

55.    During nine of the twelve months between April 2002 and March 2003, all of the farmers participating in the Program has an increase in their exposure to price risk, not a decrease. Had Volf, Prime Trading, and CHS complied with the terms of the hedging agreements, and followed the trading strategy presented to the farmers at the meetings, the farmers' exposure to price risk should have decreased.

11

56.    As a result of the fraud and unauthorized trading, beginning in the summer of 2003, the Program participants unexpectedly began to receive large margin calls. The fraud and unauthorized trading ultimately caused the farmers to lose $5.1 million without corresponding increases in the value of their cash positions.

57.    As the fraud and unauthorized trading were on-going, loan officers at the Bank, in particular, Volf, Wortman, and McFadden, routinely advanced their agricultural loan customers who were Program participants funds to cover their margin calls. In one instance, McFadden advanced margin funds to one of his customers and debited the customer's account without the customer's approval in order to cover a margin call resulting from trades executed by Prime Trading.

58.    In order to keep the Program alive, as the fraud and unauthorized trading were on-going, Prime Trading borrowed money from Five Points Bank to cover, among other things, margin calls generated by the Program. The Management Company assisted Prime Trading with its efforts to borrow money for these purposes.

59.    As the fraud and unauthorized trading were on-going, the Management Company either guaranteed the Five Points Bank loans to Prime Trading, or actually borrowed the money on Prime Trading's behalf and funneled it on to Prime Trading. For instance, in September 2002, the Management Company guaranteed a loan to Prime Trading for $625,000; and in April 2003, the Management Company's Board of Director's passed a resolution to borrow $1 million and loan it to Prime Trading so Prime Trading could reimburse losses sustained by Program participants as a result of Prime Trading's fraud and unauthorized trading.

60.    During the relevant period, as larger and larger margin calls began to mount, Program participants came to the Bank and informed the Bank's directors, officers, and loan officers, in

particular, Volf, Wortman, and McFadden (who were also directors of Prime Trading) about their grave concerns regarding the large margin calls and overall losses in their accounts.

61.    The Bank, through its agents, including but not limited to Volf, Wortman, and McFadden, knew that Volf, Prime Trading, and CHS had engaged in unauthorized trading and willfully took steps to prevent the Program participants from withdrawing from the Program by advising the Program participants to stay in the program and further representing to them that Volf would recoup all of their losses.

62.    When it became apparent to the Bank that Prime Trading Program participants would not recoup all of their losses, the Bank lent over $2.5 million in loans to over 40 Program participants.  The Bank offered these loans at below market interest rates.

63.    In or about February 2003, after the fraud and unauthorized trading were on-going for months, R.J. O'Brien (the FCM) required the Program participants to execute powers of attorney in favor of Prime Trading, thus transforming the accounts into discretionary accounts.

64.    Prior to approximately February 2003, none of the accounts were discretionary accounts and as such, defendants Volf, Prime Trading, and CHS were required by Regulation Section 166.2 to obtain prior approval for each traded.  Despite this regulatory requirement, defendants Volf, Prime Trading, and CHS did not obtain prior authorization for each trade.

**D.    Defendants Attempt to Disassociate Themselves With the Fraud and Unauthorized Trading**

65.    In June 2004, shortly after the Commission filed its injunctive action against Volf, Prime Trading, and CHS, the Management Company divested itself of all of its interest in Prime Trading.  The Management Company received no compensation for its interest in Prime Trading.

66.    The FDIC required Volf to elect between serving as president of Prime Trading and as vice-president of the Bank because of the appearance of a conflict of interest. Volf elected to remain an officer of the Bank and relinquished his responsibilities with Prime Trading.

67.    Prime Trading then changed its name to PT Holdings. PT Holdings is owned and operated by Larry Baker and Carrie Hurlburt, both former employees of Prime Trading. More specifically, Larry A. Baker is the president and principal owner of PT Holdings, and Carrie M. Hurlburt is a principal and director of PT Holdings

68.    PT Holdings continues to offer the same trading program as was offered by Prime Trading, and has taken over the accounts of all of Prime Trading's Program participants remaining in the Program.

69.    PT Holdings is located in the former offices of Prime Trading.

## VIOLATIONS OF THE ACT AND REGULATIONS

70.    Paragraphs 1 through 69 above are realleged and incorporated herein by reference into each Count alleged below.

71.    Section 166.2 of the Regulations, 17 C.F.R. § 166.2, makes it unlawful for any FCM, IB, or any of their APs to directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account:

> (a) Specifically authorized the futures commission merchant, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold); or
> (b) Authorized in writing the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the account without the customer's specific authorization; *Provided, however,* That if such futures commission merchant, introducing broker or any of their associated

persons is also authorized to effect transactions in foreign futures or foreign options without the customer's specific authorization, such authorization must be expressly documented.

72.    Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), make it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof . . .

(i) to cheat or defraud or attempt to cheat or defraud such other person; or . . .

(iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person. . . .

73.    Section 4c(b) of the Act, 7 U.S.C. § 6c(b), makes it unlawful to:

[O]ffer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. . . .

74.    Regulation 33.10, 17 C.F.R. § 33.10, makes it unlawful for any person:

[D]irectly or indirectly - (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; (c) to deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

75.    Section 4o(1) of the Act, 7 U.S.C. § 6o(1), makes it unlawful for: "[A] commodity

trading advisor, associated person of a commodity trading advisor, among others by use of the

mails or any means or instrumentality of interstate commerce, directly or indirectly - to engage in

15

any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

76.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that "[T]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his employment or office shall be deemed the act, omission, or failure of such individual association, partnership, corporation, or trust, as well as of such official, agent, or other person."

77.     Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides that "[A]ny person who commits, or who willfully aids, abets, counsels, . . . or procures the commission of a violation of this Act, . . . or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal."

## COUNT I

### Unauthorized Trading

78.     As described above, defendants Volf, Prime Trading, and CHS effected transactions in commodity interests for the accounts of customers without obtaining, before the transaction: (a) specific authorization of the customers, or persons designated by the customers to control the account, in that neither the customers nor persons designated by the customers to control the account specified (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold; or, (b) authorization, in writing, for the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the accounts without the customers' specific authorization; all in violation of Commission Regulation 166.2, 17 C.F.R. § 166.2.

79.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the unauthorized trading committed by defendants Volf, Prime Trading, and CHS.

80.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the unauthorized trading committed by defendant Volf.

81.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the unauthorized trading of defendant Prime Trading.

82.    Each act of unauthorized trading, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Commission Regulation 166.2, 17 C.F.R. § 166.2, and defendants Volf, Prime Trading, CHS, the Management Company, the Bank, and PT Holdings are liable for each and every act of unauthorized trading as a separate and distinct violation.

83.    Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their unauthorized trading and is therefore liable for such unauthorized trading pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

84.    The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their unauthorized trading.

## COUNT II

### Fraud in Connection with Commodity Futures Contracts

85.    As described above, defendants Volf, Prime Trading, and CHS in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of another person, where such contract for future delivery may be used for the purposes set forth in Section 4b(a)(2) of the Act: (i) cheated or defrauded or attempted to cheat or defraud such other person; and/or (iii) willfully deceived or attempted to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii).

86.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

87.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

88.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

89.    Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), and defendants Volf, Prime Trading, CHS, the Management Company, the

Bank, and PT Holdings are liable for each and every act of fraud trading as a separate and distinct violation.

90.     Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

91.     The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## COUNT III

### Fraud in Connection with Commodity Options Contracts

92.     As described above, defendants Volf, Prime Trading, and CHS in connection with offers to enter into, the entry into, the confirmation of the execution of and the maintenance of commodity options transactions cheated or defrauded or attempted to cheat or defraud at least one other person; and deceived or attempted to deceive at least one other person by various other means, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 33.10.

93.     Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

94.     Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

19

95.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

96.    Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 33.10. and defendants Volf, Prime Trading, CHS, the Management Company, the Bank and PT Holdings are liable for each and every act of fraud as a separate and distinct violation.

97.    Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

98.    The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## COUNT IV

### Fraud by a Commodity Trading Advisor

99.    A commodity trading advisor is defined, pursuant to Section 1a(6) of the Commodity Exchange Act, as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in - any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility any commodity option authorized under section 4c of the Commodity Exchange Act.

100.    As described above defendants Volf, Prime Trading, and CHS, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in - any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility any commodity option authorized under Section 4c of the Act, 7 U.S.C § 6(c).

101.    As described above, defendants Volf, Prime Trading, and CHS, by use of the mails and other means or instrumentality of interstate commerce, directly or indirectly - engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon clients or prospective clients in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

102.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

103.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

104.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

105.    Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) and defendants Volf, Prime Trading, CHS, the Management Company, the Bank, and PT Holdings are  liable for each and every act of fraud as a separate and distinct violation.

106.   Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

107.   The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)   an order finding that defendants violated Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b), and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2;

b)   a permanent injunction prohibiting defendants from engaging in conduct violative of Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b) and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2;

c)   an order prohibiting defendants from trading on or subject to the rules of any registered entity;

d)   an order directing defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

e)   an order directing defendants to make full restitution, pursuant to such procedure as the Court may order, to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

f)   an order directing defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

g)    such other and further remedial ancillary relief as the Court may deem appropriate.

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

/s/ Jan M. Folena

By: _____
    JAN M. FOLENA, Chief Trial Attorney
    *jfolena@cftc.gov*
    MICHAEL J. OTTEN, Senior Trial Attorney
    *motten@cftc.gov*
    Division of Enforcement
    Commodity Futures Trading Commission
    1155 21st Street, NW
    Three Lafayette Center
    Washington, D.C. 20581
    phone: (202) 418-5000/5313/5388
    fax: (202) 418-5531

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2007 DEC 17 PM 2:28

OFFICE OF THE CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| COMMERCIAL HEDGE SERVICES, INC., PRIME TRADING COMPANY, INC., LAWRENCE J. VOLF, SHERMAN COUNTY MANAGEMENT, INC, SHERMAN COUNTY BANK, AND PT HOLDINGS, INC., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

4:04CV3184

Consent Order of Permanent
Injunction and Other Equitable Relief

## CONSENT ORDER OF PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF

### I.

### INTRODUCTION

On November 24, 2004, plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed its first amended complaint ("Amended Complaint") against

defendants Commercial Hedge Services, Inc. ("CHS"), Prime Trading Company, Inc. ("PTC"),

Lawrence J. Volf ("Volf"), Sherman County Management, Inc. ("SCM"), Sherman County Bank

("SCB"), and PT Holdings, Inc. ("PTH") (collectively "defendants") seeking injunctive and other

equitable relief for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.*

(2002), and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2004).

Defendants filed their answers on January 24, 2005 denying each and every alleged violation.

00234053



Exhibit

B

## II.

### CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Amended Complaint in this action without a trial on the merits or further judicial proceedings, defendants:

1.        Consent to entry of this Consent Order of Permanent Injunction and Other Equitable Relief ("Order");

2.        By consenting to the entry of the Order, defendants neither admit nor deny any of the allegations of the Amended Complaint or any statements, findings or conclusions expressed in the Findings of Fact or Conclusions of Law contained in this Order, except as to jurisdiction and venue;

3.        Defendants do not consent to the use of this Order, or the Findings of Fact or Conclusions of Law, for any other proceeding brought by, or involving, the CFTC other than: (1) a proceeding to enforce this Order, or (2) a proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a(1) and Part 3 of the Regulations, 17 C.F.R. § 3, brought within three years from the date of this Order for the sole purpose of enforcing the prohibitions against CHS, PTC and Volf set forth in paragraph 43 of this Order. For the sole purpose of any such proceeding (1) to enforce this Order; or (2) pursuant to Section 8a of the Act and Part 3 of the Regulations, the allegations of the Amended Complaint, and the findings of fact and conclusions of law contained in this Order, shall be taken as true and correct and be given preclusive effect without further proof;

4.        Affirm that they have read and agreed to this Order voluntarily, and that no threat or promise other than as set forth specifically herein, has been made by the Commission or any

member, officer, agent or representative thereof, or by any other person, to induce consent to this Order;

     5.    Acknowledge service upon them of the summons and Amended Complaint in this action;

     6.    Admit that this Court possesses personal and subject matter jurisdiction over them and this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

     7.    Admit that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

     8.    Waive:

        a.    All claims that they may possess pursuant to the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 (2000) and 28 U.S.C. § 2412 (2000) relating to or arising from this action and any right under EAJA to seek costs, fees and other expenses relating to or arising from this action;

        b.    Any claim of double jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing injunctions, a civil monetary penalty or any other relief; and

        c.    All rights of appeal from this Order;

     9.    Consent to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order even if now or in the future defendants reside outside the jurisdiction;

     10.    Agree that neither they nor their agents, employees or representatives acting under their control, shall take any action or make any public statements denying, directly or indirectly, any allegations in the Amended Complaint or findings in this Order, or creating or tending to

00234053

create the impression that the Amended Complaint and this Order are without factual basis;
provided, however, that nothing in this provision shall affect defendants' (i) testimonial
obligations or (ii) right to take legal positions in other proceedings to which the Commission is
not a party.  Defendants will undertake all steps necessary to assure that their agents, employees
and representatives understand and comply with this agreement; and

        11.    No provision of this Order shall in any way limit or impair the ability of any
person to seek any legal or equitable remedy against any defendant in any other proceeding.

## III.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

        Being fully advised in the premises and finding that there is just cause for entry of this
Order that fully disposes of all issues in this matter, THE COURT FINDS THAT:

A.    Findings of Fact

        12.    Plaintiff, the Commission, is an independent federal agency that is charged with
administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations
17 C.F.R. §§ 1.1 *et seq.*

        13.    From approximately 1998 through approximately 2004, Defendant CHS was a
Nebraska corporation and from approximately 1998 through July 2007 was registered with the
Commission as an introducing broker ("IB").  CHS was guaranteed by R. J. O'Brien &
Associates Inc. ("R.J. O'Brien"), a futures commission merchant ("FCM") registered with the
Commission.  CHS offices were located at 1510 E. 4th Street, Suite 1, North Platte, Nebraska
69101.

        14.    Defendant PTC is a Nebraska corporation and was operated as a branch office of
CHS from approximately 1999 through July 2007.  From approximately January 2000 through

00234053               4

the present, SCM and Volf each own a 50 percent interest in PTC. PTC represents that it has not conducted commodity brokerage business since approximately June 2004. PTC had offices at 717 O Street, Loup City, Nebraska 68853.

15.    Defendant Volf resides in Loup City, Nebraska 68853. Volf was listed as a principal and registered as an associated person ("AP") of CHS from 1988 through 2007 and listed as a branch manager of CHS from 1999 through 2007. Volf was also listed as a principal and registered as an AP of PTC from 1999 through July 2007, a subsidiary of SCM and an affiliate of SCB. At all times relevant to this Order, Volf was a vice president and loan officer of SCB and had held the vice president position since 1996 and the loan officer position since 1997.

16.    Defendant PTH is a Nebraska corporation currently registered as an independent IB. PTH purchased the right to use the Prime Trading name and purchased certain tangible and intangible assets of PTC. PTH was incorporated on March 31, 2004 after all of the acts alleged in the Amended Complaint had occurred. PTH's office is currently located at 717 O Street, Loup City, Nebraska, the former office of PTC.

17.    Defendant SCM is a single bank financial holding company located in Loup City, Nebraska. SCM currently owns 100 percent of SCB and owned 50 percent of PTC from approximately January 2000 through the present. During this time period, by virtue of its 50% ownership of PTC, SCM was a principal of PTC.

18.    Defendant SCB is a state chartered bank with its principal place of business at 734 O Street, Loup City, Nebraska. SCB is insured by the Federal Deposit Insurance Corporation and is wholly owned by SCM. SCB services mainly agricultural customers that operate farms in and around Sherman County, Nebraska and some small businesses. The bulk of these agricultural customers raise corn, soybeans, and some livestock.

00234053                                    5

19.     In approximately 1999, Volf and SCM entered into an agreement to form PTC. At that time, CHS, PTC, and Volf, began a marketing program for the benefit of some of the agricultural customers of SCB and some other farmers and ranchers.

20.     According to CHS, PTC, and Volf, the program would assist SCB's customers and other farmers in the purchase and sale of futures and option contracts to market crops associated with their corn farming operations, including government subsidies. PTC's customers all opened accounts with E.D.& F. Man, a registered FCM, and then with R.J. O'Brien in order to execute the trades recommended by PTC.

21.     Volf and other SCB loan officers provided contact information regarding PTC to the SCB customers whom they believed might be interested in the trading program and referred those customers to PTC.

22.     From the inception of the trading program until approximately February 2003, the majority of PTC customers had not provided CHS or PTC with powers of attorney to trade their accounts. Although PTC conducted periodic group meetings, and some individual personal meetings and telephone conversations to discuss trades to be placed in the marketing program in the future, CHS, PTC, and Volf did not contact each customer in the marketing program to obtain their authorization for the precise commodity and the exact amount of the commodity to be purchased or sold within the proximate time that the trades were placed.

23.     The account opening documents between PTC customers and E.D. & F Mann and R.J. O'Brien included hedge agreements which indicated that the trades to be placed in the trading program were to be bona fide hedge transactions as defined by Regulation 1.3(z).

24.     CHS, PTC and Volf explained during the periodic meetings, some individual meetings and telephone conversations that the trades to be placed would be for the purpose of

00234053                                      6

hedging the risk of a fall in the price of the current year's corn crop, re-establishing ownership of the previous year's corn crop that had previously been sold and providing protection with regard to the risk of losing government subsidies. Volf explained that the trades were intended to establish a bona fide hedge as defined in Regulation 1.3(z), 17 C.F.R. § 1.3(z).

25.     Based on the purposes identified in paragraph 24, CHS, PTC and Volf placed 24 positions in the program during the time period alleged in the Amended Complaint. Of these 24 positions, however, 14 were not bona fide hedge transactions pursuant to Regulation 1.3(z), 17 C.F.R. § 1.3(z) in that they did not decrease the farmer's risk of a fall in the price of their cash corn crop. These 14 positions caused PTC's 90 customers to incur approximately $2 million in losses in their trading accounts that they would not have otherwise incurred had the transactions not been placed. Before the Commission's Amended Complaint was filed in this case, defendants had voluntarily signed settlement agreements with 89 of the 90 farm customers and paid those customers back approximately $1.4 million.

26.     When SCB's customers began to incur large margin calls in the program, Volf, encouraged the farmers to remain in the marketing program. Further, Volf, as well as other SCB loan officers, recommended and obtained loans for the farmers from SCB to cover the margin calls the farmers had incurred in the marketing program.

27.     In or about June 2004, after the Commission filed its initial Complaint in this matter, PTC ceased doing business and sold the right to use its name and certain tangible and intangible assets to PTH, an entity operating out of the office space formerly used by PTC and run by the two former employees of PTC. PTH continues to offer the same marketing program to local farmers as formerly offered by PTC.

28.    After the CFTC filed its initial complaint, 33 of the 90 former PTC customers signed written documents stating that they did not want the CFTC to pursue any claim against defendants on their behalf.

**B.**    Conclusions of Law

29.    This Court has subject matter jurisdiction over this action and the allegations in the Amended Complaint pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

30.    This Court has personal jurisdiction over defendants pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

31.    Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, because during the time of the acts complained of, defendants resided in and transacted business in the District of Nebraska.

32.    PTC, and Volf effected transactions in commodity interests for the accounts of customers without obtaining, within a proximate time before the transaction:  (a) specific authorization from the customers, or persons designated by the customers to control the account, for (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold; or (b) authorization in writing to effect transactions in commodity interests for the accounts without specific authorization, in violation of Regulation 166.2, 17 C.F.R. § 166.2.

33.    PTC and Volf, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of another person placed speculative trades in designated hedge accounts in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii).

00234053                                          8

34.    PTC and Volf, in connection with offers to enter into, the entry into, the confirmation of the execution of and the maintenance of commodity options transactions violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 33.10 (a) and (c), 17 C.F.R § 33.10(a) and (c), by placing speculative trades in designated hedge accounts.

35.    CHS, PTC, and Volf, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in contracts of sale of commodities for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility and commodity option contracts and, therefore, operated as a commodity trading advisor (CTA) pursuant to Section 1a(6) of the Act, 7 U.S.C. § 1a(6).

36.    While operating as a CTA, CHS, PTC, and Volf, by use of the mails and other means or instrumentality of interstate commerce, directly or indirectly placed speculative trades in designated hedge accounts in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

37.    SCM was a principal and PTC and Volf were its agents. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), SCM is liable for the violations committed by PTC and Volf.

38.    SCB was a principal and Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), SCB is liable for the violations committed by Volf.

## IV.

## ORDER OF PERMANENT INJUNCTION

Based upon and in connection with the foregoing conduct,

**IT IS HEREBY ORDERED THAT:**

39.    CHS, PTC, and Volf are permanently restrained, enjoined, and prohibited from directly or indirectly effecting a transaction in a commodity interest for the account of any customer without (a) specific authorization for (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold; or (b) written authorization for the transactions without specific authorization, in violation of Regulation 166.2, 17 C.F.R. § 166.2.

40.    CHS, PTC, and Volf are permanently restrained, enjoined, and prohibited from cheating or defrauding or attempting to cheat or defraud another person; and/or willfully deceiving or attempting to deceive another person, by any means whatsoever in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of another person in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), including but not limited to engaging in speculative trading in designated hedge accounts.

41.    CHS, PTC, and Volf are permanently restrained, enjoined, and prohibited from cheating or defrauding or attempting to cheat or defraud other persons; and willfully deceiving or attempting to deceive other persons in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of any commodity option transaction, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulations 33.10 (a) and (c), 17 C.F.R. § 33.10

(a) and (c), including but not limited to engaging in speculative trading in designated hedge accounts.

42.     CHS, PTC, and Volf are permanently restrained, enjoined, and prohibited from directly or indirectly using the mails and other means or instrumentality of interstate commerce to engage in transactions, practices, or courses of business that operate as a fraud or deceit upon clients or prospective clients in violation of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1), including but not limited to engaging in speculative trading in designated hedge accounts.

**IT IS FURTHER ORDERED THAT:**

43.     CHS, PTC, and Volf are, for a period of three years from the date this Order is entered, restrained, enjoined and prohibited from directly or indirectly:

    a.     engaging in, controlling or directing the trading for any commodity interests in any markets or on any entity regulated by the Commission for or on behalf of any other person or entity, whether by power of attorney or otherwise; and

    b.     applying for registration or seeking exemption from registration with the Commission in any capacity or engaging in any activity requiring registration or exemption from registration, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), and acting, directly or indirectly, as a principal, officer, director, supervisor, agent or employee of any person registered, required to be registered or exempted from registration, unless such exemption is pursuant to Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9). This includes, but is not limited to, soliciting, accepting or receiving any funds, revenue or other property from any person, giving commodity trading advice for compensation or soliciting prospective customers related to the purchase or sale of any

00234053                                                 11

commodity futures, security futures, or options on commodity futures, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

44.    CHS, PTC, and Volf are currently not registered with the Commission. CHS, PTC, and Volf, shall not reapply for registration with the Commission for a period of three years from the date this Order is entered.

**IT IS FURTHER ORDERED THAT:**

45.    SCM, for a period of three years from the date this Order is entered, is restrained, enjoined and prohibited from directly or indirectly holding an equity interest in any entity that engages in any commodity related activity.

**IT IS FURTHER ORDERED THAT:**

46.    SCB, for a period of three years from the date this Order is entered, is restrained, enjoined and prohibited from directly or indirectly employing any person or entity that is registered with the Commission and/or engages in any trading of commodity interests for others.

## V.

## ORDER FOR OTHER EQUITABLE RELIEF

**IT IS HEREBY ORDERED THAT:**

47.    **PAYMENT OF RESTITUTION:** Defendants are jointly and severally liable to pay restitution in the amount of $325,000 for which judgment is due and owing within 20 days of entry of this Order.

48.    Defendants shall make their restitution payment to the list of 57 individuals/entities and in the amounts identified in Exhibit A to this Order.

49    Defendants are prohibited from making restitution payments in excess of the amounts specified in Exhibit B to this Order to the 33 PTC customers referred to in paragraph

28 and named in Exhibit B. The restitution payments identified in Exhibit B are proportionally equivalent to the restitution payments made to the individuals/entities specified in paragraph 48 of this Order and named in Exhibit A.

50.    Defendants shall simultaneously transmit copies of the checks, or other method of payment, used to pay the individuals/entities identified on Exhibit A to this Order to Gregory Mocek, Director Division of Enforcement, or his successor, and the Office of Cooperative Enforcement, Division of Enforcement, Commodity Futures Trading Commission, at the following address: Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

51.    **PAYMENT OF CIVIL MONETARY PENALTY:** Defendants are jointly and severally liable to pay a civil monetary penalty of $100,000. Payment of the civil monetary penalty is due within 20 days of the entry of this Order. Defendants shall pay this civil monetary penalty by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, made payable to the Commodity Futures Trading Commission and sent to the Commodity Futures Trading Commission, Division of Enforcement, Attn: Marie Bateman – AMZ-300, DOT/FAA/MMAC, 6500 S. Macarthur Blvd., Oklahoma City, Oklahoma 73169. If payment by electronic funds transfer is chosen, defendants shall contact Marie Bateman at 405-954-6569 for instructions. Defendants shall accompany payment of the penalty with a cover letter that identifies defendants and the name and docket number of the proceedings. Defendants shall simultaneously transmit a copy of the cover letter and the form of payment to Gregory Mocek, or his successor, Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

00234053                                   13

## VI.

### OTHER PROVISIONS

52.     <u>Continuing Jurisdiction of This Court</u>: This Court shall retain jurisdiction over defendants to assure compliance with this Order and for all other purposes related to this action.

53.     <u>Waiver</u>: The failure of any party to this Order at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order. No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

54.     <u>Acknowledgments</u>: Upon being served with a copy of this Order after entry by this Court, defendants shall sign an acknowledgment of service and serve such acknowledgment on this Court and the CFTC within seven calendar days.

55.     <u>Invalidation</u>: If any provision or the application of any provision of this Order is held invalid, the remainder of the Order and the application of the provision to any other person shall not be affected by the holding.

56.     <u>Entire Agreement and Amendments</u>: This Order incorporates all of the terms and conditions of the settlement among the parties hereto. Nothing shall serve to amend or modify this Order in any respect whatsoever, unless: (1) reduced to writing; (2) signed by all parties hereto, and (3) approved by further order of this Court.

57.     <u>Notices</u>: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to the Commission: Attention,

00234053                                                14

Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement,

1155 21st Street, N.W., Washington, DC 20581.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter

this Order.

Done and **ORDERED** in Chambers at Lincoln, Nebraska, this 17th day of

December, 2007.

_____
HONORABLE RICHARD G. KOPF
UNITED STATES DISTRICT JUDGE

_____
Lawrence J. Volf

Date: 9-10-07

_____
Lawrence J. Volf for
defendants Commercial Hedge Services, Inc., and
Prime Trading Company, Inc.,

Date: 9-10-07

Larry Baker for
Defendant PT Holdings, Inc.

Date: 9-12-07

_____
Gerald Wortman for
defendants Sherman County Management, Inc.
and Sherman County Bank

Date: 9-13-2007

00234053                                          15

Edward H. Tricker, Esquire
Attorney for defendants, Lawrence J. Volf,
Commercial Hedge Services, Inc., Prime
Trading Company, Inc., and PT Holdings, Inc.
Woods & Aitken
301 South 13th Street
Suite 500
Lincoln, Nebraska 68508
(402) 437-8510 (telephone)
(402) 437-8558 (facsimile)

Date: 9/20-07

Thomas E. Johnson, Esquire
Attorney for defendants, Sherman
County Management, Inc. and Sherman
County Bank
Baird Holm, LLP
1500 Woodman Tower
Omaha, Nebraska 68102
(402) 344-0500 (telephone)
(402) 231-8554 (facsimile)

Date: 9/20/07

Richard Glaser, Esquire
Attorney for Plaintiff
U. S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5358 (telephone)
(202) 418-5538 (facsimile)

Date: 12/11/07

00234053                              16

## EXHIBIT A

| | Name | Account # | Payment Due |
|---|---|---|---|
| 1 | Deriso, John | 35213 | $5,522.04 |
| 2 | Rogers, Eric | 35287 | $3,681.36 |
| 3 | Kuszak, David J. | 35297 | $12,424.58 |
| 4 | Wells, Jay | 35607 | $330.46 |
| 5 | Wardyn, Leonard | 35609 | $4,601.70 |
| 6 | Augustyn, Andy | 35612 | $4,601.70 |
| 7 | MAD Enterprises | 35665 | $18,406.79 |
| 8 | Felton, Tom | 35672 | $5,522.04 |
| 9 | Felton, John | 35673 | $9,203.39 |
| 10 | Lansman, Roger | 35686 | $6,902.54 |
| 11 | Kulwicki, Ron | 35687 | $5,522.04 |
| 12 | Wells, Errol | 35691 | $8,839.25 |
| 13 | Cunningham, Chris | 35692 | $5,522.04 |
| 14 | Cunningham, Larry | 35693 | $4,601.70 |
| 15 | Rasmussen Bros. | 35694 | $10,220.29 |
| 16 | Foth, Steve | 35699 | $1,840.68 |
| 17 | Ruth, Russell | 75700 | $460.17 |
| 18 | Lammers, Bros | 75701 | $2,297.14 |
| 19 | Cone, Ross | 75703 | $2,761.02 |
| 20 | Rasmussen, Ryan | 75707 | $319.29 |
| 21 | Ritz, Sterling | 75708 | $2,761.02 |
| 22 | Wades, Randy | 73709 | $5,522.04 |
| 23 | Walrath, Scott | 75712 | $2,472.33 |
| 24 | Sherman Acres | 75713 | $1,840.68 |
| 25 | Dorsey Farms Inc | 75714 | $7,190.53 |
| 26 | Ritz, Bryce | 75716 | $1,840.68 |
| 27 | Kruml, Edward | 75720 | $3,681.36 |
| 28 | Novak, Keith | 75722 | $11,504.24 |
| 29 | Krzycki, Kenneth | 75724 | $920.34 |
| 30 | Edwards, Inc. | 75725 | $4,601.70 |
| 31 | Peters, Michael | 75727 | $8,283.06 |
| 32 | TK Farms Inc | 75729 | $11,504.24 |
| 33 | Kuszak, Justin | 75730 | $7,822.88 |
| 34 | JNR Farms, Inc | 75731 | $29,677.57 |
| 35 | Herbig, John | 75733 | $3,221.19 |
| 36 | Kuhn, Robert | 75738 | $7,362.71 |
| 37 | Wells, Lois | 75739 | $4,089.40 |
| 38 | Scott, Duane | 75740 | $8,442.38 |
| 39 | Knuth, Richard | 75747 | $14,725.43 |
| 40 | Davis Bros, Inc | 75750 | $4,141.53 |
| 41 | Kuhlman, Tony | 75751 | $5,522.04 |
| 42 | Kuhlman, Larry | 75752 | $5,522.04 |
| 43 | D&E Partnership | 75753 | $3,681.36 |
| 44 | Townsend, Alan | 75754 | $9,203.39 |
| 45 | Box Elder Ranch | 75755 | $9,203.39 |
| 46 | Schilling, Ron | 75756 | $1,380.51 |
| 47 | Lindsten, Rod | 75757 | $1,561.96 |
| 48 | Briney, Scott | 75758 | $13,805.09 |
| 49 | Wiley, Robin | 75759 | $920.34 |
| 50 | Keller, Albert | 75760 | $1,840.68 |
| 51 | Stamel, Bert | 75761 | $954.83 |
| 52 | Wil Lou, Inc. | 75762 | $7,362.71 |
| 53 | White, Charles B | 75763 | $4,141.53 |
| 54 | Southwind Farm | 75764 | $4,141.53 |
| 55 | Steven & Graves | 75765 | $1,380.51 |
| 56 | Bracelin Bros | 75766 | $920.34 |
| 57 | Denny Nickelson F | 75767 | $2,272.30 |
| | Total | | $325,000.00 |

# EXHIBIT B

| | Name | Account # | Payment Allowed |
|---|---|---|---|
| 1 | WO Zangger | 35223 | $3,221.19 |
| 2 | Pinneo, Lynn | 35236 | $11,504.24 |
| 3 | Snow, Sid | 35266 | $2,300.85 |
| 4 | Snow, Rod | 35272 | $2,300.85 |
| 5 | Stanczyk, Bryan | 35280 | $2,300.85 |
| 6 | Stanczyk, James | 35282 | $11,044.07 |
| 7 | Bader, Steven | 35606 | $4,601.70 |
| 8 | Double O Farms | 35615 | $3,681.36 |
| 9 | Gydesen, Dennis | 35616 | $3,221.19 |
| 10 | Ruth, Ronald | 35642 | $2,300.85 |
| 11 | Ruth, Randy | 35643 | $1,840.68 |
| 12 | Loeffelbein, Ken | 35666 | $15,186.60 |
| 13 | Jacobs, Duane | 35670 | $7,362.71 |
| 14 | Rademacher, Larry | 35676 | $4,141.53 |
| 15 | Lewandowski, Don | 35679 | $5,061.87 |
| 16 | Obermiller, Tom | 35680 | $460.17 |
| 17 | Harrington, Dick | 35681 | $1,840.68 |
| 18 | Smedra, Tom | 35682 | $4,141.53 |
| 19 | Kusek, Paul | 35684 | $1,380.51 |
| 20 | Klinginsmith, Scott | 35689 | $7,822.88 |
| 21 | Jarzynka, Jerry | 35698 | $1,380.51 |
| 22 | Morrow, Don | 33776 | $3,681.36 |
| 23 | Obermiller, John | 35786 | $14,725.43 |
| 24 | Robertson, James | 35788 | $2,300.85 |
| 25 | Thede, Mike | 75706 | $30,831.37 |
| 26 | Stepanek, Edward | 75710 | $5,522.04 |
| 27 | Bruha, Jerome | 75717 | $2,300.85 |
| 28 | Eurek, Frank | 75718 | $2,300.85 |
| 29 | Kusek, Rick | 75719 | $3,681.36 |
| 30 | Vogt, Joyce | 75721 | $3,681.36 |
| 31 | Jones, Brian | 75723 | $10,123.73 |
| 32 | Duester, Tim | 75735 | $2,300.85 |
| 33 | Obermiller, Tim | 75745 | $1,840.68 |
| | Totals | | $180,386.50 |

## R. J. O'BRIEN
### Security Agreement and Assignment of Account

THIS ACCOUNT CONTROL AGREEMENT dated as of _____ Jan 9 ___ 20___ (the "Agreement"), among _____ (together with its successors and assigns, the "Debtor") _____ (together with its successors and assigns, the "Secured Party") and R. J. O'BRIEN, an Illinois corporation (together with its successors and assigns, the "Commodity Intermediary").

WHEREAS, The Debtor and the Secured Party are parties to a Secured Financing Agreement dated as of a date even herewith which provides for the Debtor to grant a security interest in certain assets to the Secured Party (the "Financing Agreement"); and

WHEREAS, the assets pledged to the Secured Party include interests of the Debtor in its Trading Account at the Commodity Intermediary (each as defined below); and

WHEREAS, it is a condition to the provision of financing under the Financing Agreement that the Debtor, the Secured Party and the Commodity Intermediary enter into an Account Control Agreement;

NOW THEREFORE, in consideration of the mutual agreements and covenants herein contained and for other good and valuable consideration, the parties hereby agree as follows:

SECTION 1.    Definitions.  As used herein, the following terms have the following meanings:

"Distributions" means interest, dividends or distributions on any Investment Property or other property that is credited to the Trading Account.

"Entitlement Order" shall have the meaning provided in Section 4.

"Investment Property" shall mean any "investment property", as defined in Section 9-102(a)(49) of the UCC.

"Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"Person" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Proceeds" shall mean all cash and other proceeds and all other profits, products, rents or receipts, in whatever form, arising from the collection, sale, lease, exchange, assignment, licensing or other disposition of, other realization upon any Investment Property or other property that is credited to the Trading Account.

"Trading Account" shall have the meaning provided in Section 2(a)(i).

"Trading Account Property" shall mean each item of property (whether Investment Property, a security, a security entitlement, a commodity contract, an instrument or cash), including Proceeds and Distributions (i) that is or may in the future be standing to the credit of the Trading Account, (ii) that has been received and accepted, or may in the future be received and accepted, by the Commodity Intermediary for credit to the Trading Account or (iii) as to which the Commodity Intermediary is or may in the future become obligated by law, regulation, rule or agreement to credit to the Trading Account.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of Illinois.

SECTION 2.    Establishment of Trading Account

(a)    The Commodity Intermediary hereby confirms and agrees that:

(i)    At the request of, and for the account of the Debtor, as owner of the assets therein, the Commodity Intermediary has established account number _____ in the name _____ as Debtor (such account and any successor account, being herein called the "Trading Account"). The Commodity Intermediary shall not change the name or account number of the Trading Account without the prior written consent of the Secured Party.

(ii)    Any and all monies or payments which may be received by the Debtor, to which the Secured Party is entitled under and by reason of this Agreement, shall be received by the Debtor as trustee for the Secured Party and shall be immediately delivered in kind to the Secured Party without commingling.

(iii)    The Trading Account is an account to which Investment Property is or may be credited.

(iv)    Except for margin, commission and fee payments required to be made in respect of the Trading Account, no debit of cash to the Trading Account shall be made except pursuant to written instructions from the Secured

Revised 04/02
CHDBM {39033609_3 940X0; 120X/C  94132310

Exhibit

C

SCB98788

Party, and the Commodity Intermediary shall forthwith honor all debit instructions from the Secured Party transmitting such disbursement in immediately available funds as instructed.

(b)    The Debtor hereby constitutes and appoints the Secured Party its true, lawful and irrevocable attorney, to demand, receive and enforce payments and to give receipts, releases, satisfaction for, and to sue for all monies payable to the Debtor, and this may be done in the name of the Secured Party with the same force and effect as the Debtor could do had this Agreement not been made.

(c)    The Debtor agrees to take such steps and execute and deliver (or cause the execution and delivery of) such financing and other documents, agreements (including, without limitation, security agreements) and papers (all in form and substance acceptable to the Secured Party) as the Secured Party may from time to time request to perfect or preserve the security interest granted hereby.

SECTION 3.    Payment of Funds.

(a)    The Commodity Intermediary will comply with all notifications it receives directing it to liquidate or redeem any property in the Trading Account originated by the Secured Party without further consent by the Debtor. The Secured Party is hereby authorized and fully empowered without further authority from the Debtor to request the Commodity Intermediary to pay to the Secured Party funds that may hereafter be withdrawable or payable out of the Trading Account, and the Commodity Intermediary is hereby authorized and directed to pay such funds to the Secured Party upon its demand. The Secured Party is also hereby authorized and fully empowered without further authority from the Debtor to request the Commodity Intermediary to remit to the Secured Party any funds that may be due to the Debtor, and the Commodity Intermediary is hereby authorized and directed to pay to the Secured Party such sums as the Commodity Party shall so request or demand without the consent of, or notice to, the Debtor. The Debtor agrees not to withdraw or attempt to withdraw any funds or other property from the Trading Account except as permitted by the Secured Party.

(b)    Any sums paid by the Commodity Intermediary from the Trading Account to the Secured Party shall be applied by the Secured Party to the payment of any indebtedness owed by the Debtor to the Secured Party. Any balance remaining after the payment of said indebtedness shall be paid by the Secured Party to the Debtor. The receipt or receipts of the Secured Party for such funds so paid to it by the Commodity Intermediary shall, as to the Commodity Intermediary, operate as the receipt by the Debtor as fully and as completely as if funds had been paid to the Debtor in person and receipted for by the Debtor.

SECTION 4.    Entitlement Orders.

(a)    The Debtor hereby grants its continuing consent to the Commodity Intermediary to comply with any and all notifications, whether written or oral, communicated to the Commodity Intermediary directing transfer, liquidation, or redemption of any of the Trading Account Property (each such notification being referred to herein as an "Entitlement Order") originated by the Secured Party, without any further consent by the Debtor or any other Person.

(b)    Nothing herein contained shall be construed so as to prevent the Debtor from remaining the owner, subject to the interest for the Secured Party as it may appear, of the Trading Account. Until the Secured Party elects to the contrary and delivers notice of such election in writing to the Commodity Intermediary, the Debtor may make such additional transactions in said account as the Commodity Intermediary shall be willing to accept for execution and/or clearance. In the event the Secured Party does make such election and delivers such notice in writing to the Commodity Intermediary, the Debtor shall not thereafter execute any transactions in the Trading Account, and the Commodity Intermediary shall cease complying with orders or other directions concerning the Trading Account originated by the Debtor. Upon receipt by the Commodity Intermediary of notice of such election and if directed by the Secured Party, the Commodity Intermediary will use commercially reasonable efforts to cancel open orders that have been entered by the Debtor through the Commodity Intermediary which have not yet been executed. If the Commodity Intermediary is unable to cancel such orders before they are executed, the transactions will be considered valid and binding on the Debtor and the Secured Party. In the event that orders are executed for the Debtor's account by a third party pursuant to the terms of a "give-up" or similar agreement among the Debtor, the Commodity Intermediary and such third party, the Commodity Intermediary will use commercially reasonable efforts, subject to the terms of such agreement, to notify such third party that the Commodity Intermediary will not thereafter accept trades executed by such third party for clearance into the Debtor's account.

(c)    The Commodity Intermediary has not entered into any agreement with the Debtor or any other Person purporting to limit or condition the obligation of the Commodity Intermediary to comply with Entitlement Orders originated by the Secured Party.

(d)    If at any time the Commodity Intermediary shall receive any Entitlement Order from the Secured Party, the Commodity Intermediary shall comply with such Entitlement Order without further consent by the Debtor or any other Person, notwithstanding that such Entitlement Order may conflict with any instruction or notification by the Debtor or any other Person.

Revised 04/02
CHDB04 12931404.2 044302 1300C 94132370

SCB000781

(e)    The Commodity Intermediary need not investigate whether the Secured Party is entitled under the Secured Party's agreements with the Debtor to give an Entitlement Order or a notice of exclusive control. The Commodity Intermediary may rely on notices and communications it reasonably believes are given by the appropriate party.

(f)    The Commodity Intermediary will not be liable to the Secured Party for complying with orders or other instructions from the Debtor that are received by the Commodity Intermediary before the Commodity Intermediary has received and had reasonable opportunity to act on the Secured Party's notice of election of exclusive control.

(g)    The rights and powers granted to the Secured Party under this Section 4 and the other provisions of this Agreement have been granted in order to perfect the Secured Party's Lien with respect to the Trading Account and the Trading Account Property, are powers coupled with an interest, and will not be affected by the bankruptcy of the Debtor or by the lapse of time.

SECTION 5.    Additional Rights of the Secured Party

(a)    Whenever the Secured Party deems it necessary for its protection, it shall be entitled, without the consent or concurrence of or prior notice to the Debtor, to direct the Commodity Intermediary to liquidate any of all then outstanding open positions in the Trading Account and to direct the Commodity Intermediary to pay to the Secured Party any credit balance as shall exist in the Trading Account after such liquidation and after the payment to the Commodity Intermediary of all indebtedness of the Debtor to the Commodity Intermediary in connection with transactions in the Debtor's accounts with the Commodity Intermediary. The Debtor shall be liable to the Commodity Intermediary for any debit or deficit that may be created when the Secured Party initiates a liquidation.

(b)    If the Commodity Intermediary requires additional margin for an open position, the Secured Party shall advance to the Commodity Intermediary on behalf of the Debtor such amounts as may be required by the Commodity Intermediary to margin such position, or shall give the Commodity Intermediary reasonable notice of its intent not to advance such margin as stated below; provided, however, that the Debtor in all respects shall remain liable to the Secured Party for any amount so advanced. The Secured Party shall notify the Commodity Intermediary immediately, and in no event more than one business day after the Commodity Intermediary requests additional margin, if the Secured Party determines not to make any further advance or extension of credit on behalf of the Debtor.

(c)    The Debtor and the Secured Party agree that the Secured Party may obtain additional collateral for the Debtor obligations and that the Secured Party may proceed hereunder against the Trading Account or resort to any other collateral, or both, in its sole discretion.

SECTION 6.    Commodity Intermediary Lien.    The security interest and Lien of the Secured Party against the Debtor's Trading Account is subject to the Commodity Intermediary's right of set-off and to the prior payment of all indebtedness of the Debtor to the Commodity Intermediary as such may exist from time to time, including fees and commissions which may have been incurred in connection with the Debtor's transactions with the Commodity Intermediary, and to the Commodity Intermediary's Lien and the right of foreclosure thereof in connection with the indebtedness of the Debtor to the Commodity Intermediary (including any right of the Commodity Intermediary to liquidate open positions or exercise commodity options, all without prior demand for additional margin and without prior notice).

SECTION 7.    Governing Law.

(a)    Regardless of any provisions of any other agreement, this Agreement, the Trading Account, Trading Account Property, or other property therein shall be governed by and construed in accordance with the internal law (excluding the conflict-of-law rules) of the State of Illinois.

(b)    Regardless of any provision in any other agreement, for purposes of Sections 9-304, 9-305, 9-306 and 9-110(e) of the UCC, the Commodity Intermediary's jurisdiction and the location of the accounts established pursuant to Section 2 hereof shall be deemed to be the State of Illinois, and the parties agree that none of them has entered or will enter into any agreement to the contrary.

SECTION 8.    Conflict with Other Agreements.    In the event of any conflict between the terms of the Commodity Intermediary's account agreement (or any portion thereof) with the Debtor and this Agreement, such account agreement shall prevail. In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, other than such account agreement, the terms of this Agreement shall prevail.

SECTION 9.    Amendments.    No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

SECTION 10.    Severability.    To the extent any provision of this Agreement is found by a tribunal of competent jurisdiction to be unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.

SECTION 11.  Successor and Assigns. This Agreement shall be binding upon and inure to the benefit of the Debtor, the Secured Party and the Commodity Intermediary and their respective successors (including their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law and not by agreement or other voluntary act) and assigns, except that neither the Debtor nor the Commodity Intermediary may assign or delegate any of its respective rights or obligations under this Agreement without the prior written consent of the Secured Party. In the event of any assignment by the Secured Party, the Secured Party shall give written notice of such assignment to the Debtor and the Commodity Intermediary and the assignee will thereupon be the Secured Party hereunder, with all the same rights, duties and privileges as though originally named as the Secured Party hereunder.

SECTION 12.  No Adverse Claims. Except for the claims and interest of the parties hereto in the Trading Account and the Trading Account Property, the Commodity Intermediary does not know of any claim to, or interest in, the Trading Account or the Trading Account Property. If any Person notifies the Commodity Intermediary that it is asserting any Lien or adverse claim (including, but not limited to, any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Trading Account or the Trading Account Property, the Commodity Intermediary will promptly notify the Secured Party and the Debtor thereof.

SECTION 13.  Maintenance of Trading Account. In addition to, and not in lieu of, the obligation of the Commodity Intermediary to honor Entitlement Orders as agreed in Section 4 hereof, the Commodity Intermediary agrees to maintain the Trading Account as follows:

(a)     The Commodity Intermediary will promptly send copies of all statements, confirmations and other correspondence concerning the Trading Account to Debtor and, upon the request of the Secured Party, simultaneously to the Secured Party at the address provided in this Agreement.

(b)     All items of income, gain, expense and loss recognized in the Trading Account shall be reported to taxing authorities under the name and taxpayer identification number (if applicable) of the Debtor.

SECTION 14.  Representations and Warranties of the Commodity Intermediary.

(a)     The Commodity Intermediary covenants, represents and warrants as follows (where applicable, within the meaning of relevant provisions of the UCC and Code of Federal Regulations).

(i)     that it is a "Commodity Intermediary" (as defined in Section 9-102(a)(17) of the UCC);

(ii)     that the Commodity Intermediary has not entered into, and until the termination of this Agreement will not enter into without the consent of the Secured Party, any arrangements granting or purporting to grant "control" (as defined in Section 9-106 of the UCC) over the Trading Account or the Trading Account Property with any Person except the Secured Party;

(iii)     that the Trading Account (A) is or has been established as set forth in Section 2 above, (B) is a "commodity account" as such term is defined in Section 9-102(a)(14) of the UCC, and (C) will be maintained in the manner set forth herein until termination of this Agreement; and

(iv)     that this Agreement is the valid and legally binding obligation of the Commodity Intermediary.

SECTION 15.  Indemnification and Exculpation of the Commodity Intermediary. The Debtor and the Secured Party, jointly and severally, hereby agree that (a) the Commodity Intermediary (which shall include for purposes of the entirety of this Section 15, its directors, officers, employees, and agents) is released from any and all liabilities to the Debtor and the Secured Party arising from the terms of this Agreement and the compliance of the Commodity Intermediary with the terms of this Agreement, except to the extent that such liabilities arise from the Commodity Intermediary's bad faith, gross negligence or willful misconduct and (b) the Debtor and the Secured Party and their successors and assigns, jointly and severally, shall at all times indemnify and save harmless the Commodity Intermediary from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the Financing Agreement or the compliance of the Commodity Intermediary with the terms hereof, except to the extent that such arises from the Commodity Intermediary's bad faith, gross negligence or willful misconduct and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and disbursements and other expenses of every nature and character arising by reason of the same. This indemnity shall survive the termination of the Agreement and the resignation or removal of the Commodity Intermediary.

SECTION 16.  Notices. Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below; provided, however, that Entitlement Orders may be given orally and if so will be deemed in here been properly given at the time of oral delivery. In the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by telecopy or otherwise, the Commodity Intermediary is

4

SCB00783

authorized to seek confirmation of such instructions by telephone call-back to the source at the source's voice number as set forth below, and the Commodity Intermediary may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone number for call-backs may be changed only in writing actually received and acknowledged by the Commodity Intermediary. The parties to this Agreement acknowledge that such security procedure is commercially reasonable.

| Debtor: | | Secured Party: | |
|---|---|---|---|
| [Company Name] | Jay Bull | [Company Name] | SHERMAN CO. BANK |
| [Address Line 1] | 2430 Rose Rd | [Address Line 1] | BOX 513 |
| [Address Line 2] | Elba, Nebraska | [Address Line 2] | LOUP CITY, NE  68853 |
| Telephone Number: | ( ) | Telephone Number: | ( ) |
| Facsimile Number: | ( ) | Facsimile Number: | ( ) |
| | Please Print | | Please Print |

Commodity Intermediary:

R. J. O'Brien
222 S. Riverside Plaza
Chicago, Illinois 60606
Telephone Number: (312) 373-5000
Facsimile Number: (312) 373-5225

Any party may change his, her or its address for notices in the manner set forth above.

SECTION 17.   Termination.   The obligations of the Commodity Intermediary to the Secured Party pursuant to this Agreement shall continue in effect until the security interest of the Secured Party in the Trading Account and the Trading Account Property has been terminated pursuant to the terms of the Financing Agreement and the Secured Party has notified the Commodity Intermediary of such termination in writing. The termination of this Agreement shall not terminate the Trading Account or alter the obligations of the Debtor to the Commodity Intermediary pursuant to any other agreement with respect to the Trading Account.

SECTION 18.   Counterparts.   This Agreement may be executed in one or more counterparts (including faxed versions) each of which shall be deemed an original agreement, but all of which together constitute one and the same instrument.

IN WITNESS THEREOF, the undersigned have signed this Agreement as of the first date mentioned above.

_____, as Debtor

By: _____

Name: _____   Title: _____

_____, as Secured Party

By: _____

Name: _____   Title: _____

R.J.O'BRIEN, as Commodity Intermediary

By: _____

Name: _____   Title: _____

Rev. 4/02