## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

_____

| | | |
|---|---|---|
| PRIME TRADING COMPANY, INC., | ) | Case No. 1:08-CV-00154 |
| | ) | |
| Plaintiff, | ) | Judge Kennelly |
| | ) | Magistrate Judge Ashman |
| v. | ) | |
| | ) | |
| R. J. O'BRIEN & ASSOCIATES, INC., an | ) | |
| Illinois Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

_____

### AMENDED COMPLAINT FOR DAMAGES
### AND DEMAND FOR JURY TRIAL

Plaintiff, Prime Trading Company, Inc., for its Amended Complaint against R. J. O'Brien & Associates, Inc. states and alleges as follows:

### STATEMENT OF PARTIES

1.      Plaintiff Prime Trading Company, Inc. ("Prime Trading"), is a Nebraska corporation with its principal place of business in Nebraska.

2.      Defendant, R. J. O'Brien & Associates, Inc. ("RJO"), is an Illinois corporation engaged in business as a commodities broker and futures commission merchant whose principal place of business is in Chicago, Cook County, Illinois.

### JURISDICTION AND VENUE

3.      This is a civil action in which the Court has jurisdiction, pursuant to 28 U.S.C. § 1332(a), in that the Plaintiff and Defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.      Venue is appropriate under 28 U.S.C. § 1391(a)(1) and (c) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Defendant is subject to personal jurisdiction in this District.

<u>**General Allegations**</u>

5.      This Amended Complaint arises out of the same series of transactions as alleged in the Commodities Futures Trading Commission's ("CFTC") First Amended Complaint for Injunctive and Other Equitable Relief and For a Civil Monetary Penalty ("CFTC Complaint) which the CFTC filed against Plaintiff and others ("CFTC Lawsuit"), a true and correct copy of which is attached hereto as Exhibit A.

6.      Without admitting any of the allegations in the CFTC Complaint or in the CFTC Lawsuit, and expressly reserving all of the denials which have been or may hereafter be asserted, this Amended Complaint refers to, and incorporates herein by reference, the allegations set forth in the CFTC Complaint.

7.      The CFTC Complaint alleges that Plaintiff and others engaged in acts and practices in violation of various provisions of the Commodity Exchange Act, 7 U.S.C. § 1 et seq. ("Act") and the regulations promulgated thereunder, 17 C.F.R. § 1 et seq. ("Regulations") with regard to Prime Trading's 2002 marketing program (the "2002 Trading Program").

8.      The CFTC Complaint alleges that between April 2002 through at least March 2003, Plaintiff and others committed fraud and executed unauthorized trades in numerous customers' commodity accounts in violation of various provisions of the Act and Regulations. The CFTC Complaint alleges that the Nebraska farmers that were customers (the "Prime Customers") of Prime Trading and participated in the 2002 Trading Program lost approximately Five Million One Hundred Thousand Dollars ($5,100,000.00) as a result of the alleged

violations. The CFTC Complaint seeks an order directing Plaintiff and others to make "full restitution" to every Prime Customer who lost money as a result of the alleged wrongful conduct.

9. On or about December 17, 2007, a Consent Order of Permanent Injunction and Other Equitable Relief was issued in the CFTC Lawsuit ("Consent Order") finding that Plaintiff and others are jointly and severally liable to pay restitution in the amount of $325,000 to 57 Prime Customers. A true and correct copy of the Consent Order is attached hereto as Exhibit B.

10. The determination that $325,000 was to be paid to 57 Prime Customers was based in part on the facts that:

a. Plaintiff had previously made $320,000 in restitution payments to Prime Customers related to the losses the Prime Customers sustained in the 2002 Trading Program (the "Pre-litigation Restitution Payments"); and

b. Thirty-three of the 90 Prime Customers signed written documentation stating that they did not want the CFTC to pursue any claim against Prime on their behalf.

11. Plaintiff's liability for the $320,000 Pre-litigation Restitution Payments were derived solely from, or concurrent with, the acts, failure to act and liability of RJO and the $320,000 payment was in excess of Plaintiff's pro rata share of the common liability of Plaintiff and RJO.

12. Pursuant to the Consent Order, Prime made $325,000 in restitution payments to 57 Prime Customers (the "Consent Order Restitution Payments").

13. Plaintiff's liability for the $325,000 Consent Order Restitution Payments were derived solely from, or concurrent with, the acts, failure to act and liability of RJO and the

$325,000 payment was in excess of Plaintiff's pro rata share of the common liability of Plaintiff and RJO.

14.    After the Consent Order was issued, Prime Trading made $196,000 in restitution payments to the 33 Prime Customers who had stated that they did not want the CFTC to pursue any claim against Prime Trading (the "Post-litigation Restitution Payments").

15.    Plaintiff's liability for the $196,000 Post-litigation Restitution Payments were derived solely from, or concurrent with, the acts, failure to act and liability of RJO and the $196,000 payment was in excess of Plaintiff's pro rata share of the common liability of Plaintiff and RJO.

16.    In addition to the claims asserted by the CFTC in the CFTC Complaint, certain Prime Customers have also asserted restitution and other claims against Plaintiff and others regarding losses which the customers allegedly suffered in their accounts with Prime Trading, and some of those Prime Customers filed lawsuits against Plaintiff and others ("Prime Customer Lawsuits").

17.    The Prime Customer Lawsuits included claims against Prime Trading for violations of the Commodity Code, Commodity Exchange Act, fraud, breach of a fiduciary duty and negligence.

18.    Plaintiff incurred and paid approximately $620,000 in attorney fees defending the CFTC Lawsuit and the Prime Customer Lawsuits.

19.    Lawrence Joseph Volf ("Volf") was one of the codefendants in the CFTC Lawsuit and the Prime Customer Lawsuits and is jointly and severally liable for the $325,000 Consent Order Restitution payment and is jointly and severally liable for the $620,000 in attorney fees incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

20.     Volf has made a payment of $80,000 to Plaintiff in relation to his joint and several liability for the $325,000 Consent Order Restitution payment and the $620,000 in attorney fees.

21.     Sherman County Management, Inc. was one of the codefendants in the CFTC Lawsuit and the Prime Customer Lawsuits and is jointly and severally liable for the $325,000 Consent Order Restitution payment.

22.     Sherman County Management, Inc. has made a payment of $80,000 to Plaintiff in relation to its joint and several liability for the $325,000 Consent Order Restitution payment.

23.     Plaintiff has denied that it was in any manner responsible for the alleged injuries and damages suffered by the Prime Customers.  If, however, any liability is imposed on Plaintiff as a result of the matters alleged and/or asserted by Prime Customers, that liability could only be derived solely from, or concurrent with, the acts, failure to act and liability of RJO.

**Prime Trading Trades**
**Commodities Futures on Behalf of Farmers**

24.     In or about 1999, Prime Trading began offering commodities brokerage services in Sherman County, Nebraska.  As part of Prime Trading's business in Sherman County, Prime Trading bought and sold options, known as "puts" and "calls," on commodities futures contracts.

25.     Farmers in and around Loup City, Nebraska, and in Kansas authorized Prime Trading to purchase and sell options on commodities futures contracts, thereby becoming customers of Prime Trading.

26.     Prime Trading was a guaranteed broker of certain futures commission merchants ("FCM") whose role was to accept funds from customers and fill orders at the commodities exchange.

00265664.5

27.     At all relevant times Volf was listed as a principal and registered as an "associated person" of Prime Trading and was the President of Prime Trading.

28.     From 1999 through March 2002, Prime Trading used E.D. & F. Man International, Inc. ("Man") as its FCM.

29.     At the end of March 2002, Prime Trading bulk transferred the accounts from Man to RJO, and Man assigned its customer accounts to RJO at that time.

<u>**The 2002 Trading Program**</u>

30.     In the Spring of 2002, Volf and Lawrence Baker, an independent contractor associated with Prime Trading ("Baker"), began enrolling customers for participation in Prime Trading's 2002 marketing program (the "2002 Trading Program").

31.     The 2002 Trading Program involved a combination of strategies, including marketing the 2002 crops to be grown and also re-establishing the ownership of 2001 crops that had been previously sold in cash markets via long futures and/or call options strategies.  Another strategy of the 2002 Trading Program was to utilize government farm subsidy payments to enhance overall farm income potential by either protecting against potential loss of these government payments and/or relying on them to offset potential losses in futures and/or options positions established in the customers' trading accounts.

32.     From April 2002 through July 2003, as part of the 2002 Trading Program, Prime Trading was authorized by the Prime Customers to buy and sell numerous "put" and "call" options on futures contracts to accomplish the objectives of the 2002 Trading Program.

33.     At the end of November 2002, it was determined that the existing protective long December put option positions held by the Prime Customers needed to be rolled forward into protective long March put option positions.  RJO accepted the orders to roll forward the

protective long December put option positions without dispute or any further requirements and despite outstanding and unpaid customer margin calls.  RJO agreed that any outstanding and unpaid customer margin calls could be paid after the protective long December put option positions were rolled forward into protective long March put option positions.  The protective long December put options which were rolled forward were set to expire on approximately November 20, 2006.   All outstanding and unpaid customer margin calls were subsequently paid after the protective long December put option positions were rolled forward into protective long March put option positions.

34.    The basis of the 2002 Trading Program at the end of November 2002 was to maintain long futures while maintaining protective long "put" option positions.  The trading strategy was to maintain this position until the corn futures market rallied approximately 25 cents per bushel.  The trading strategy required expiring protective put options positions to be "rolled forward" to another contract month until the approximately 25 cents per bushel price rally took place in the corn futures market.

35.    At customer meetings held on December 2, 3 and 4, 2002 (the "December Customer Meetings"), Volf explained to customers participating in the 2002 Trading Program that certain  set backs had been incurred in the Program.

36.    During the December Customer Meetings Volf described the nature of the set backs as well as what the 2002 Trading Program strategy would be from that point forward. Volf also informed the customers that they could either stay with the 2002 Trading Program, albeit at a risk of future losses, or that they could discontinue trading in the 2002 Trading Program immediately.  All but one customer chose to remain in the 2002 Trading Program.

37.    On or about December 13, of 2002, Volf traveled to Chicago to meet with representatives of RJO, including Beth Anderson, Mike O'Mally and Mary Ellen Scanlin, to explain the 2002 Trading Program and discuss the timely payment of customer margin calls (the "December RJO Meeting").  At this meeting, RJO representatives told Volf that they wanted Prime Trading to "re-paper" all of the accounts that Man had assigned to RJO.  RJO required the following documentation from Prime Customers:  (a) risk disclosures, (b) RJO account agreements, (c) a power of attorney giving Volf absolute authority over customer accounts, (d) new security agreements, and (e) position ratification statements.  RJO stated that it would be willing to continue to accept orders to facilitate the execution of the 2002 Trading Program after customers executed the aforementioned documentation.  Pursuant to RJO's requirement and upon request by Prime Trading, nearly all of the Prime Customers executed the above-listed documents.

38.    At the December RJO Meeting, Volf described in detail for RJO the future trading strategies for the 2002 Trading Program, including the use of long corn futures and protective long put option positions to help mitigate the risk of the long corn futures.  These positions considered together are what are commonly referred to as "synthetic call options."  Volf also informed RJO that one component of the strategy included capturing extrinsic (time) values from short call and put option positions.  RJO was also informed that if the strategy did not come to fruition prior to the time the protective put options were set to expire, the protective put options would be rolled forward to give the strategy additional time to come to fruition.  Volf explained to RJO that corn prices needed to increase approximately 25 cents per bushel for this particular strategy to come to fruition.  RJO stated that it would allow Prime Trading to proceed with its

strategy and that RJO would accept orders on behalf of the Prime Customers to accomplish the strategy as described by Volf.

39.    Prior to and after the December RJO Meeting and the December Customer Meetings, Volf and Baker explained to Prime Customers that some of the strategies used in the 2002 Trading Program could potentially generate large margin calls and that customers would need to have financial arrangements made in advance to cover those margin calls.

40.    Accordingly, the majority of Prime Customers asked the Sherman County Bank and/or other banks (collectively the "Lenders") to provide credit to cover the potential margin calls, and the Lenders agreed to provide that credit.  In January 2002, RJO requested that the Lenders and the customer execute a Security Agreement and Assignment of Account ("Security Agreement") with regard to each of the customers obtaining such credit.  The Security Agreement allowed the Lenders to fund margin calls on behalf of the customers in return for a security interest in the customers' RJO accounts.  A true and correct copy of a representative example of a Security Agreement is attached as Exhibit C and is incorporated herein by this reference.

41.    Under the Security Agreements, RJO incurred certain duties and obligations, including an obligation to notify the Lenders of any outstanding margin call that might threaten the Lenders' security interests in the customers' accounts.  RJO was to give the Lenders a reasonable opportunity to meet the margin call so as to protect the Lenders' security interests.

42.    At the end of February 2003, it was once again determined by Volf that to carry out the 2002 Trading Program strategy as presented in the December RJO Meeting and the December Customer Meetings, the existing protective long March put option positions needed to be rolled forward into protective long May put option positions.  RJO again accepted the orders

to roll forward the protective long March put option positions without dispute or any further requirement and despite outstanding and unpaid customer margin calls. RJO, through its Margin Call Clerk, John "Digger" Loftis, agreed that any outstanding and unpaid customer margin calls could be paid after the protective long March put option positions were rolled forward into protective long May put option positions. The protective long March put option positions which were rolled forward were set to expire on approximately February 20, 2003. All outstanding and unpaid customer margin calls were subsequently paid after the protective long March put option positions were rolled forward into protective long May put option positions.

43.    On or about April 24, 2003, many of the Prime Customers received a margin call from RJO. A large number of these margin calls were first day margin calls; however, a few of the Prime Customers had extended margin calls.

44.    On or about April 24, 2003, Volf discussed with RJO the need to again roll positions forward, as the protective long May put options were about to expire. Volf and RJO discussed the outstanding margins calls then in existence and Volf requested that RJO allow the Prime Customers to pay the margin calls after the positions were rolled forward in the same manner as the margin calls had been paid in November of 2002 and February of 2003. RJO's Margin Call Clerk, John "Digger" Loftis, informed Volf that it would be acceptable to RJO if the Prime Customers paid the margin calls after the positions were rolled forward (the "April 2003 Discussion"). All outstanding and unpaid customer margin calls were subsequently paid.

**RJO Refuses to Process Customer Orders**
**After Bank Offers to Cover Outstanding Margin Calls**

45.    On April 29, 2003, Prime Trading began entering orders to roll the positions forward pursuant to the strategy that was discussed with the Prime Customers during the December Customer Meetings and RJO during the December RJO Meeting and during the April

2003 Discussion. After some of the protective orders were accepted and filled by RJO on April 29, 2003, a floor trader for the first time informed Volf that RJO would not accept any more of the protective orders from Prime Trading.

46.    In response to the floor trader's unexpected refusal to accept the protective orders from Prime Trading, Volf immediately called Mike O'Malley ("O'Malley"), an employee/ representative of RJO, to find out the reason the protective orders were not being accepted. O'Malley informed Volf that the protective orders were not being accepted because of outstanding customer margin calls.

47.    After speaking with O'Malley, Volf immediately called Jerry Wortman, the President of the Sherman County Bank ("Wortman"), and informed him of the situation. Volf, Wortman and Baker called O'Malley on April 29, 2003. During this phone conversation, O'Malley again stated that RJO would not accept any more protective orders from Prime Trading due to outstanding customer margin calls. In response to O'Malley's comment, Wortman informed O'Malley that the Sherman County Bank would wire an amount of funds sufficient to cover the outstanding margin calls within the hour. O'Malley told Wortman that even if the funds were sent, RJO would continue to refuse orders from Prime Trading. O'Malley failed and refused on behalf of RJO, to provide any further explanation for RJO's unexpected refusal to accept additional protective orders from Prime Trading.

48.    As a direct consequence of RJO's refusal to accept the orders to establish protective positions, the risk exposure to all of the Prime Customers was substantially increased. Further, Prime Trading was required by RJO to immediately liquidate all of the remaining unprotected long future positions and had no alternative but to immediately liquidate all of the remaining unprotected long futures positions before the corn futures market rallied and met the

goal of an approximate 25 cent per bushel increase. Accordingly, all of the remaining

unprotected long futures positions were liquidated. In addition, RJO also required Prime Trading

to liquidate certain short option positions as well. Such liquidations were completed by not later

than April 29, 2003.

      49.    Because RJO refused to let the Lenders protect the Prime Customers' investments

by making the outstanding margin calls, the Prime Customers were forced by RJO to abandon

the remaining unprotected positions. Had RJO honored and fulfilled its promises and

agreements as it had done previously and as it had repeatedly advised Volf that it would do, the

Prime Customers would have been able to stay with their positions and they would have met the

stated objectives of the 2002 Trading Program within 10 days following April 29, 2003, during

which the market rallied and met the goal of an approximate 25 cent per bushel increase.

      50.    Any damages allegedly suffered by the Prime Customers are a proximate result of

RJO's wrongful, improper, arbitrary and capricious refusal to accept orders from Prime Trading

on April 29, 2003, and the resulting forced liquidation of the Prime Customers' accounts.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

      For its First Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this

Amended Complaint as if fully set forth herein.

      51.    Plaintiff was a third-party beneficiary to the Security Agreement.

      52.    All conditions precedent to the bringing of this action have been performed by

Plaintiff and/or excused or waived by the actions or inactions of RJO.

      53.    RJO's agreements and statements in November and December 2002, and in

February and April 2003, that it would continue to accept orders to facilitate the 2002 Trading

Program, that it would accept orders to roll forward protective long positions despite outstanding

margin calls and that any outstanding margin calls could be paid after the positions were rolled forward constituted a modification to the Security Agreement and/or a separate oral agreement between RJO and Prime Trading (the "Oral Agreement").

54.    RJO's actions and performance in November and December 2002, and in February and April 2003, of continuing to accept orders to facilitate the 2002 Trading Program, accepting orders to roll forward protective long positions despite outstanding margin calls and allowing outstanding margin calls to be paid after the positions were rolled forward constituted a modification to the Security Agreement and/or an Oral Agreement.

55.    RJO breached the Security Agreement and/or Oral Agreement, acted in bad faith, engaged in willful misconduct, and was grossly negligent when it:

      a.    Refused to accept the protective orders on April 29, 2003;

      b.    Required that the remaining unprotected long future positions be immediately liquidated;

      c.    Required that certain short option positions be immediately liquidated;

      d.    Failed to notify the Lenders within a reasonable time period of any outstanding margin call that might threaten the Lenders' security interests in the customers' accounts; and

      e.    Failed to give the Lenders a reasonable opportunity to meet the margin call so as to protect the Lenders' security interests.

56.    RJO breached the implied contractual obligations of good faith and fair dealing incorporated into the Security Agreement and/or the Oral Agreement when RJO unreasonably,

arbitrarily and capriciously exercised what RJO believes was its wide discretion to accept or refuse to accept trades and refused to accept the protective orders on April 29, 2003.

57.    RJO breached the implied contractual obligations of good faith and fair dealing incorporated into the Security Agreement and/or the Oral Agreement when RJO unreasonably, arbitrarily and capriciously exercised what RJO believes was its wide discretion to require the liquidation of the remaining long future positions and certain short positions and required the liquidation of the remaining long future positions and certain short positions.

58.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts with respect to the 2002 Trading Program.

59.    To the extent the Prime Customers suffered any losses in their commodity accounts as aforesaid, those losses were the proximate result of RJO's breaches of the Security Agreement and/or the Oral Agreement.

60.    Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers is derived from, and proximately caused by, RJO's breaches of the Security Agreement and/or the Oral Agreement, and RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

61.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of RJO's breaches of the Security Agreement and/or Oral Agreement.

62.     Plaintiff incurred and paid approximately $620,000 in attorney fees and costs in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by RJO's breach of the Security Agreement and/or the Oral Agreement, and RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its First Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $841,000 in restitution paid to the Prime Customers, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## SECOND CLAIM FOR RELIEF
## INDEMNITY

For its Second Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this Amended Complaint as if fully set forth herein.

63.     The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

64.     To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the acts or omissions of RJO, including but not limited to, RJO's negligent refusal to accept the protective orders from Prime Trading on April 29, 2003, RJO's requirement that all remaining long positions be immediately liquidated, RJO's requirement that certain short positions be immediately liquidated, RJO's negligent

00265664.5

- 15 -

misrepresentations, and RJO's negligent placement of allegedly non-hedge trades in hedge accounts.

65.     Plaintiff and RJO had entered into a contract, Plaintiff had acted as a guaranteed broker for RJO and Plaintiff and RJO had developed a relationship prior to RJO's engaging in the negligent acts.

66.     Plaintiff was guiltless with regard to RJO's refusal to accept the protective orders on April 29, 2003, RJO's requirement that all remaining long positions be immediately liquidated, RJO's requirement that certain short positions be immediately liquidated, and RJO's negligent misrepresentations, and RJO's conduct with regard to the negligent placement of allegedly non-hedge trades in hedge accounts was qualitatively worse than Plaintiff's conduct.

67.     RJO's breaches of the Security Agreement and/or Oral Agreement allegedly caused Plaintiff to breach its contractual and/or quasi-contractual obligations to the Prime Customers.

68.     Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers is derived from, and proximately caused by, the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct which in justice should be paid by RJO.

69.     If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct which in justice should be paid by RJO.

00265664.5

- 16 -

70.    Plaintiff incurred and paid approximately $620,000 in attorney fees and costs in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by RJO's acts and omissions, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct which in justice should be paid by RJO.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Second Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## THIRD CLAIM FOR RELIEF
## CONTRIBUTION

For its Third Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this Amended Complaint as if fully set forth herein.

71.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

72.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the acts or omissions of RJO, including but not limited to, RJO's negligent failure and refusal to accept the protective orders on April 29, 2003, RJO's requirement that all remaining long positions be immediately liquidated, RJO's requirement that certain short positions be immediately liquidated, RJO's negligent

misrepresentations and RJO's negligent placement of allegedly non-hedge trades in hedge accounts.

73.    Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers is derived from, and proximately caused by, the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct, and the $841,000 in payments made by Plaintiff were in excess of Plaintiff's pro rata share of the common liability of Plaintiff and RJO.

74.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct which in justice should be paid by RJO.

75.    Plaintiff incurred and paid approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by the acts or omissions of RJO, including but not limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct, and the $620,000 in payments made by Plaintiff were in excess of Plaintiff's pro rata share of the common liability of Plaintiff and RJO.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Third Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers, for any further restitution

amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## FOURTH CLAIM FOR RELIEF
## SUBROGATION

For its Fourth Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this Amended Complaint as if fully set forth herein.

76.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

77.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of the acts or omissions of RJO, including but not limited to, RJO's negligent failure and refusal to accept the protective orders on April 29, 2003, RJO's requirement that all remaining long positions be immediately liquidated, RJO's requirement that certain short positions be immediately liquidated, RJO's negligent misrepresentations and RJO's negligent placement of allegedly non-hedge trades in hedge accounts.

78.    RJO is primarily liable for the losses suffered by the Prime Customers.

79.    Plaintiff was compelled to pay the $841,000 in restitution payments which Plaintiff paid to the Prime Customers as a partial discharge of its existing liability to the Prime Customers, and Plaintiff is asserting its right of subrogation against RJO for those payments.

80.    Plaintiff incurred and paid approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by the acts or omissions of RJO, including but not

00265664.5

limited to, RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Fourth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to the $841,000 in restitution payments which Plaintiff paid to the Prime Customers, together with Plaintiff's liability for the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

### FIFTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

For its Fifth Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this Amended Complaint as if fully set forth herein.

81.    At all times relevant hereto, Plaintiff was engaged in business relating to the providing of brokerage services and had a pecuniary interest in the business transactions that are the subject matter of this action.

82.    At all times relevant hereto, Plaintiff was relying upon and looking to RJO for guidance as to RJO's particular knowledge, expertise and skill in connection with the placing of positions in the commodities market.

83.    At all times relevant hereto, RJO was engaged in business relating to the providing of brokerage services and had a pecuniary interest in the transactions that are the subject matter of this action, and RJO was in the business of supplying information for the guidance of others in their business transactions and in connection with the placing of positions in the commodities market.

00265664.5

84.     During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO, through its Margin Call Clerk, John "Digger" Loftis and others, represented that it would continue to accept the protective long put option positions which were part of Prime Trading's trading strategy for the 2002 Trading Program since November 2002.

85.     Upon information and belief, RJO made these representations for the benefit and guidance of Plaintiff in its business transactions relating to the 2002 Trading Program.

86.     Upon information and belief, RJO made these representations with the intention or knowledge that the representations would influence Plaintiff's business transactions relating to the 2002 Trading Program.

87.     Plaintiff reasonably relied on RJO's representations and Plaintiff refrained from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

88.     RJO failed to exercise reasonable care or competence in making the representations to Plaintiff.

89.     The representations that RJO made were false and, in fact, on April 29, 2003, RJO refused to accept the protective orders.

90.     The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses which the Prime Customers allegedly sustained in their commodity accounts.

91.     To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of Plaintiff's reliance on the misrepresentations made by RJO.

00265664.5

92.     Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers is derived from, and proximately caused by, Plaintiff's reliance on the misrepresentations made by RJO and by RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

93.     If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of Plaintiff's reliance on the misrepresentations made by RJO and as a result of RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

94.     Plaintiff incurred and paid approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits, which fees and costs were proximately caused by Plaintiff's reliance on the misrepresentations made by RJO, and by RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Fifth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

## SIXTH CLAIM FOR RELIEF
## PROMISSORY ESTOPPEL – DETRIMENTAL RELIANCE

For its Sixth Claim for Relief, Plaintiff incorporates paragraphs 1 through 50 of this Amended Complaint as if fully set forth herein.

95.    During conversations that RJO had with Volf between December 2002 and April 29, 2003, including, but not limited to, the December RJO Meeting and the April 2003 Discussion, RJO represented that it would continue to accept the protective long put option positions that were part of Prime Trading's trading strategy since November 2002.

96.    Upon information and belief, RJO made these representations with the intention or knowledge that the representations would influence Plaintiff's business transactions relating to the 2002 Trading Program.

97.    Plaintiff reasonably relied on RJO's representations and Plaintiff refrained from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders.

98.    Plaintiff was unaware that RJO would not accept the protective orders that Prime Trading attempted to place on April 29, 2003 and, in fact, RJO's previous actions and statements affirmatively evidence that such protective orders would be accepted by RJO.

99.    RJO should have reasonably foreseen and expected Plaintiff to rely on its representations and that Plaintiff would refrain from instituting alternative trading strategies and/or from obtaining the services of another commodity broker to place the protective orders as a result of RJO's representations.

100.    The CFTC and certain Prime Customers have asserted restitution claims against Plaintiff for losses that the Prime Customers allegedly sustained in their commodity accounts.

00265664.5

101.    To the extent the Prime Customers suffered any losses in their commodity accounts, those losses were the proximate result of Plaintiff's reliance on the misrepresentations made by RJO.

102.    Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers is derived from, and proximately caused by, Plaintiff's reliance on the misrepresentations made by RJO and by RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct..

103.    If Plaintiff has any further liability to any of the Prime Customers for the losses the Prime Customers allegedly sustained in their commodity accounts, and if Plaintiff will have to pay any further restitution to the Prime Customers for any of those alleged losses, RJO is liable to Plaintiff for any restitution payments as a result of Plaintiff's reliance on the misrepresentations made by RJO and as a result of RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

104.    Plaintiff incurred and paid approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits which fees and costs were proximately caused by Plaintiff's reliance on the misrepresentations made by RJO and by RJO's acts of bad faith, misconduct and its willful, malicious and actively tortious and negligent conduct.

WHEREFORE, Plaintiff, Prime Trading Company, Inc., prays for judgment against Defendant, R. J. O'Brien & Associates, Inc., on its Sixth Claim for Relief in an amount that has not yet been finally ascertained but which is equal to Plaintiff's liability for the $841,000 in restitution payments which Plaintiff paid to the Prime Customers, for any further restitution amount for which Plaintiff is liable to the Prime Customers, together with Plaintiff's liability for

00265664.5

the approximately $620,000 in attorney fees and costs which were incurred in defending the CFTC Lawsuit and the Prime Customer Lawsuits.

DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, Prime Trading Company, Inc., hereby demands a trial by jury to be held in the Northern District of Illinois, Eastern Division, in this matter.


Dated this 8th day of May, 2008.


PRIME TRADING COMPANY, INC., Plaintiff


By    s/Edward H. Tricker
       Edward H. Tricker, Neb. No. 15504
       Attorney for Plaintiff
       WOODS & AITKEN LLP
       301 South 13th Street, Suite 500
       Lincoln, Nebraska  68508
       Telephone:  402-437-8500
       Facsimile:  402-437-8558
       etricker@woodsaitken.com

and

       Jeffrey Schulman, No. 2513080
       Attorney for Plaintiff
       WOLIN & ROSEN, LTD.
       55 West Monroe, 36th Floor
       Chicago, Illinois  60603
       Telephone:  312-424-0600
       Facsimile:  312-424-0660
       jschulman@wolinlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Vincent J. Connelly**
courtnotification@mayerbrown.com
- **Marshall E. Hanbury**
courtnotification@mayerbrown.com
- **Doressia LaShun Hutton**
courtnotification@mayerbrown.com
- **Jeffrey A. Schulman**
jschulman@wolinlaw.com

s/Edward H. Tricker
Edward H. Tricker, Neb. No. 15504
Attorney for Plaintiff
WOODS & AITKEN LLP
301 South 13th Street, Suite 500
Lincoln, Nebraska  68508
Telephone:  402-437-8500
Facsimile:   402-437-8558
etricker@woodsaitken.com

00265664.5