**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEBRASKA**

COMMODITY FUTURES      :
TRADING COMMISSION      :     CIVIL ACTION NO.:  4:04CV3184
     :
              Plaintiff,     :
     :
     :     FIRST AMENDED COMPLAINT
              v.         :     FOR INJUNCTIVE AND OTHER
     :     EQUITABLE RELIEF AND FOR A
Commercial Hedge Services, Inc.      :     CIVIL MONETARY PENALTY
d.b.a. Prime Trading Company,      :
Prime Trading Company, Inc.,      :
Lawrence Joseph Volf,      :
PT Holdings, Inc. d.b.a. Prime Trading,      :
Sherman County Management, Inc.,      :
and Sherman County Bank      :
     :
     :
              Defendants.     :

COMES NOW the Commodity Futures Trading Commission ("Commission"), by

counsel, and for its First Amended Complaint alleges as follows:

<u>SUMMARY</u>

1.     As is more fully set forth and alleged below, defendants Commercial Hedge Services,

Inc. ("CHS"), Prime Trading Company, Inc. ("Prime Trading"), Lawrence Joseph Volf ("Volf"),

PT Holdings, Inc. ("PT Holdings"), Sherman County Management, Inc. ("Management

Company"), and Sherman County Bank ("Bank") have engaged in acts and practices that

constitute violations of the Commodity Exchange Act, as amended ("the Act"), 7 U.S.C. §§ 1 *et*

*seq.* (2002) and the Commission Regulations ("Regulations") §§ 1.1 *et seq.* (2004).

2.     Beginning in approximately April 2002 through at least March 2003 ("the relevant

period"), defendants Volf, Prime Trading, and CHS committed fraud and executed unauthorized

**EXHIBIT**

**_A_**

trades in more than 80 Nebraska farmers' commodity futures hedge accounts in violation of Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b), and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2.

3.    Prime Trading was a non-bank subsidiary of the Management Company and provided commodity trading advice for the purpose of assisting the bank and bank customers.

4.    The farmers opened hedge accounts to protect themselves from a decrease in the price of their corn crops. Despite the fact that the farmers' account opening documents clearly indicated that the accounts were hedge accounts, to be used only for the purpose of executing bona fide hedge transactions, Volf, Prime Trading, and CHS executed speculative trades that the farmers did not authorize. During most of the months in question defendants Volf, Prime Trading, and CHS, without the farmers' authorization, fraudulently initiated overall long positions that increased the farmers' risk should there be a decrease in the price of corn. Volf, Prime Trading, and CHS disregarded the hedge agreements in the farmers' account opening documents and executed unauthorized speculative trades that ultimately caused the farmers to lose approximately $5.1 million.

5.    Moreover, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that they were hedging their corn crop, in particular, that they were decreasing their risk should there be a fall in the price of corn. In reality, however, defendants Volf, Prime Trading, and CHS executed a trading strategy that consistently increased the farmers' price risk.

6.    During the relevant period, defendant Bank willfully aided and abetted defendants Volf, Prime Trading, and CHS in committing fraud and unauthorized trading, and therefore is liable for that fraud and unauthorized trading pursuant to Section 13(a) of the Act, 7 U.S.C. § 13(c).

7.    During the relevant period, defendant Bank was a principal, and defendant Volf was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud and unauthorized trading committed by defendant Volf.

8.    During the relevant period, defendant Management Company was a principal, and defendant Prime Trading was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud and unauthorized trading committed by defendant Prime Trading.

9.    At or about the time the Commission first filed its Complaint against defendants Volf, Prime Trading, and CHS, Prime Trading essentially changed its name to PT Holdings.  PT Holdings became a continuation of, and successor corporation to Prime Trading and is therefore liable for Prime Trading's fraud and unauthorized trading.

10.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations.  In addition, the Commission seeks civil monetary penalties, restitution to farmers for losses caused by defendants' fraud, disgorgement of defendants' ill-gotten gains, a trading prohibition and such other relief as this Court may deem necessary or appropriate.

11.    Unless restrained and enjoined by this Court, defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## JURISDICTION AND VENUE

12.    This Court possesses jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person

has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper District Court of the United States against such person to enjoin such practice or to enforce compliance with the Act.

13.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because defendants are found in, inhabit, or transact business in the District of Nebraska, and the acts and practices in violation of the Act have occurred within this District, among other places.

## THE PARTIES

14.    **Plaintiff Commodity Futures Trading Commission** is the independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et. seq*, as amended, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et. seq*. The Commission's main office is located at 1155 21st Street, NW, Washington, DC 20581.

15.    **Defendant Commercial Hedge Services, Inc.** is a Nebraska corporation and is currently registered with the Commission as an Introducing Broker ("IB") and with the Securities and Exchange Commission as Notice Broker Dealer. CHS is guaranteed by R. J. O'Brien & Associates Inc. ("R.J. O'Brien), a Futures Commission Merchant ("FCM") registered with the Commission. CHS has offices at 1510 E. 4th Street, Suite 1, North Platte, Nebraska 69101.

16.    **Defendant Prime Trading Company, Inc.** is a Nebraska corporation and was operated as a branch office of CHS. During the relevant period, Sherman County Management, Inc. and Lawrence Joseph Volf each owned a fifty percent (50%) interest in Prime Trading. Prime Trading has offices at 717 O Street, Loup City, Nebraska 68853.

17.    **Defendant Lawrence Joseph Volf** resides at 1120 West 4th Street, North Platte, Nebraska 69101. Volf has been listed as a principal and registered as an Associated Person ("AP") of CHS since 1988, and registered as a Branch Manager of CHS since 1999. Volf is listed as a principal and registered as an AP of Prime Trading, a subsidiary of the Management Company and an affiliate of the Bank.

18.    **Defendant PT Holdings, Inc.** is a Nebraska corporation and does business as Prime Trading. PT Holdings is the successor corporation of Prime Trading and is currently registered as an independent IB. PT Holdings is located at 717 O Street, Loup City, Nebraska, the former office of Prime Trading.

19.    **Defendant Sherman County Management, Inc.** is a single bank financial holding company located in Loup City, Nebraska. The Management Company currently owns 100 percent of the Bank, and owned a 50 percent (50%) interest in Prime Trading from approximately January 2000 through approximately June 2004. The Management Company is listed with the Commission as a principal of Prime Trading.

20.    **Defendant Sherman County Bank** is a state chartered bank with its principal place of business at 734 O Street, Loup City, Nebraska. The Bank is insured by the Federal Deposit Insurance Corporation and is wholly owned by the Management Company.

### FACTUAL BACKGROUND

A.    **The Relationship Between Volf, Prime Trading, the Management Company, and the Bank**

21.    During the relevant period, the Bank serviced mainly agricultural customers and some small businesses. The bulk of the Bank's agricultural customers raised mainly corn and livestock.

22.    During the relevant period, the Bank provided operating loans to most of its agricultural customers.

23.    During the relevant period, Gerald Wortman ("Wortman") was an employee of the Bank; served as the Bank's president; was a loan officer at the Bank; and sat on the board of directors of the Bank, the Management Company, and Prime Trading.

24.    During the relevant period, George McFadden ("McFadden") was an employee of the Bank; served as the Bank's senior vice president; was a loan officer at the Bank; and sat on the board of directors of the Bank, the Management Company, and Prime Trading.

25.    During the relevant period, Volf was an employee of the Bank, served as the Bank's vice president, was a loan officer at the Bank, was an employee of Prime Trading, served as the president of Prime Trading, owned a fifty percent (50%) interest in Prime Trading, and sat on the board of directors of Prime Trading and the Bank.  As such, Volf was an agent of Prime Trading and an agent of the Bank.

26.    In or about 1999, Wortman, McFadden, and possibly other Bank employees, determined that the Bank's agricultural loan customers, in particular those that raised corn, were not achieving the best returns on their crops and, therefore, were not fully maximizing their yearly income.

27.    Wortman, McFadden, and possibly other Bank employees, believed that if their agricultural loan customers (and other customers) achieved higher returns on their crops, their customers' wealth would increase.  They believed that if their customers' wealth increased, then in turn, the wealth and security of the Bank would increase.

28.    To address these issues, Wortman, McFadden, and possibly other Bank employees, determined that the Bank customers needed agricultural commodity trading services so they could access and benefit from the futures market.

29.    As a result, Wortman consulted Volf, a Bank employee and agent, with the specific purpose of discussing the establishment of an agricultural commodity trading program for the Bank's customers. Wortman knew that Volf had prior commodity trading experience and that Volf had been associated with CHS since 1988.

30.    As a result of his meeting(s) with Volf, Wortman, and possibly other Bank employees, determined that the Bank would seek to provide commodity trading services to its agricultural customers. Banking regulations, however, prohibited the Bank from directly providing such services to its customers. Banking regulations did allow the Management Company (the Bank's parent company) to operate a non-bank subsidiary to provide such services to Bank customers.

31.    As a result of the regulatory restraints, the Bank consulted the Management Company about acquiring a commodity trading firm as a non-bank subsidiary for the purpose of assisting the Bank's agricultural customers. The board of directors of the Management Company, which included Wortman and McFadden, agreed to the acquisition of a fifty percent (50%) interest in Prime Trading.

32.    On or about December 28, 1999, Volf incorporated Prime Trading. Pursuant to an agreement with the Management Company, Volf transferred a fifty percent (50%) interest in Prime Trading to the Management Company in exchange for Management Company issuing Volf twenty-two (22) shares of the Management Company's stock.

33.    After the stock transfer which gave the Management Company a fifty percent (50%) interest in Prime Trading, the Management Company subsequently listed itself with the Commission as a principal of Prime Trading and held Prime Trading as a non-bank subsidiary.

34.    Prime Trading formed a board of directors that included Wortman, McFadden, and Volf.

35.    A portion of each meeting of the Management Company's board of directors was typically devoted to issues relating to Prime Trading, and Volf often appeared at these meetings to provide information about Prime Trading and to discuss Prime Trading issues.  Wortman also advised the Management Company's board of directors regarding issues and developments surrounding Prime Trading.

36.    At the time the Management Company acquired a fifty percent (50%) interest in Prime Trading, Prime Trading did not have any customers.

37.    In order to get customers for Prime Trading, the Bank, through its agents (including but not limited to Wortman, McFadden, and Volf), all acting in their capacity as agents of the Bank, identified and selected Bank agricultural customers that they believed should participate in Prime Trading's agricultural commodity trading program (the "Program").

38.    After Wortman, McFadden, Volf (and possibly other Bank officials and employees) identified the Bank customers they believed would benefit from the services offered by Prime Trading, Wortman invited those Bank customers to attend a meeting with Volf and, in some cases, suggested to bank customers that they open commodity trading accounts with Prime Trading.

39.    During the relevant period, Bank loan officers, including but not limited to Volf, acting in their capacity as agents of the Bank, and in furtherance of that agency, solicited Bank agricultural customers (and potential Bank customers) to open commodity trading accounts with

8

Prime Trading. For example, one individual (not a previous Bank customer) came to the Bank to apply for a home mortgage loan. Bank employees discussed the home mortgage with him, then told this home mortgage customer that he should participate in Prime Trading's commodity trading program, and referred him to Volf to open a hedge account with Prime Trading.

40.     Prime Trading ultimately developed the Program for the Bank's customers. Bank customers solicited into the Program by Bank directors, officers, and employees signed hedge agreements and initially opened accounts with E.D. and F. Man as the FCM. Those accounts were subsequently transferred to a new FCM, R.J. O'Brien.

41.     Prime Trading held approximately four meetings per year regarding the Program during which Volf explained the status of the market for corn and potential trading strategies for protecting Program participants from a fall in the price of their crops, in particular, corn.

42.     Wortman encouraged his loan officers to attend such meetings so they could be knowledgeable about the Program and so they could discuss the Program with the Bank's loan customers.

43.     The meetings were generally scheduled without much advance notice and, of the more than 80 Program participants, between 20 and 50 attended. Wortman and McFadden attended most, if not all, of these meetings.

44.     Volf informed Program participants and potential Program participants at his meetings that if Prime Trading customers were also customers of the Bank, the Bank would cover their margin calls, "no questions asked."

**B.**    **Trading Activity in the Program Participants' Hedge Accounts**

45.    Shortly after the Management Company acquired its interest in Prime Trading, Bank customers began to set up non-discretionary hedge accounts with Prime Trading. Pursuant to those hedge agreements, Prime Trading began to enter into trades on behalf of the customers.

46.    As part of the Program, from approximately April 2002 through at least March 2003, defendants Volf, Prime Trading, and CHS traded in non-discretionary hedge accounts for more than 80 farmers located in and around Sherman County, Nebraska. The trades were executed by R.J. O'Brien. Volf did so in his capacity as an agent of Prime Trading and the Bank, and in furtherance of those agency relationships.

47.    The farmers produced corn and, therefore, were long the cash corn market. In order to protect against price fluctuations in the corn market, each farmer's hedge account was only to be used for the purpose of executing bona fide hedge transactions.

48.    During the meetings regarding the Program, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that they were hedging on the farmers' behalf, when, in fact, they were actually speculating. In particular, defendants Volf, Prime Trading, and CHS fraudulently led the farmers to believe that their exposure to price risk would be decreased when, in fact, defendants' trading strategy consistently increased the farmers' price risk.

49.    Defendants Volf, Prime Trading, and CHS executed trades for or on behalf of the farmers, placed batch orders for those trades, and allocated the executed trades on a pro-rated basis among the hedge accounts.

50.    Defendants Volf, Prime Trading, and CHS primarily traded in options on futures contracts, which they occasionally exercised, resulting in the assignment of futures contracts to the hedge accounts. On occasion, they also purchased futures contracts.

10

51.    The farmers' hedge accounts were traded in a fraudulent manner not authorized by their owners. The farmers' purpose in engaging the services of defendants was to hedge the farmers' corn crops. The farmers never requested nor authorized defendants Volf, Prime Trading, and CHS to make speculative trades in their accounts. The farmers never requested nor authorized defendants to increase their net long positions.

52.    Defendants Volf, Prime Trading, and CHS did not, prior to the purchase or sale, tell each farmer the precise commodity interest or the exact amount of the commodity interest that they were going to buy or sell for the farmer.

53.    Prior to the purchase or sale, defendants Volf, Prime Trading, and CHS did not obtain from each farmer the precise commodity interest or the exact amount of the commodity interest that the farmer wished to buy or sell for his hedge account.

C.    **The On-Going Fraud and Unauthorized Trading**

54.    From April 2002 through at least March 2003, rather than reducing the farmers' price risk, defendants Volf, Prime Trading, and CHS fraudulently initiated net long positions in the hedge accounts that increased the farmers' downward price risk in nine of the twelve months of trading. Moreover, defendants Volf, Prime Trading, and CHS fraudulently initiated positions in the hedge accounts – by purchasing futures contracts and buying and selling puts and calls (options) – that resulted in net long positions, thereby increasing the farmers' price risk.

55.    During nine of the twelve months between April 2002 and March 2003, all of the farmers participating in the Program has an increase in their exposure to price risk, not a decrease. Had Volf, Prime Trading, and CHS complied with the terms of the hedging agreements, and followed the trading strategy presented to the farmers at the meetings, the farmers' exposure to price risk should have decreased.

11

56.     As a result of the fraud and unauthorized trading, beginning in the summer of 2003, the Program participants unexpectedly began to receive large margin calls. The fraud and unauthorized trading ultimately caused the farmers to lose $5.1 million without corresponding increases in the value of their cash positions.

57.     As the fraud and unauthorized trading were on-going, loan officers at the Bank, in particular, Volf, Wortman, and McFadden, routinely advanced their agricultural loan customers who were Program participants funds to cover their margin calls. In one instance, McFadden advanced margin funds to one of his customers and debited the customer's account without the customer's approval in order to cover a margin call resulting from trades executed by Prime Trading.

58.     In order to keep the Program alive, as the fraud and unauthorized trading were on-going, Prime Trading borrowed money from Five Points Bank to cover, among other things, margin calls generated by the Program. The Management Company assisted Prime Trading with its efforts to borrow money for these purposes.

59.     As the fraud and unauthorized trading were on-going, the Management Company either guaranteed the Five Points Bank loans to Prime Trading, or actually borrowed the money on Prime Trading's behalf and funneled it on to Prime Trading. For instance, in September 2002, the Management Company guaranteed a loan to Prime Trading for $625,000; and in April 2003, the Management Company's Board of Director's passed a resolution to borrow $1 million and loan it to Prime Trading so Prime Trading could reimburse losses sustained by Program participants as a result of Prime Trading's fraud and unauthorized trading.

60.     During the relevant period, as larger and larger margin calls began to mount, Program participants came to the Bank and informed the Bank's directors, officers, and loan officers, in

particular, Volf, Wortman, and McFadden (who were also directors of Prime Trading) about their grave concerns regarding the large margin calls and overall losses in their accounts.

61.    The Bank, through its agents, including but not limited to Volf, Wortman, and McFadden, knew that Volf, Prime Trading, and CHS had engaged in unauthorized trading and willfully took steps to prevent the Program participants from withdrawing from the Program by advising the Program participants to stay in the program and further representing to them that Volf would recoup all of their losses.

62.    When it became apparent to the Bank that Prime Trading Program participants would not recoup all of their losses, the Bank lent over $2.5 million in loans to over 40 Program participants.  The Bank offered these loans at below market interest rates.

63.    In or about February 2003, after the fraud and unauthorized trading were on-going for months, R.J. O'Brien (the FCM) required the Program participants to execute powers of attorney in favor of Prime Trading, thus transforming the accounts into discretionary accounts.

64.    Prior to approximately February 2003, none of the accounts were discretionary accounts and as such, defendants Volf, Prime Trading, and CHS were required by Regulation Section 166.2 to obtain prior approval for each traded.  Despite this regulatory requirement, defendants Volf, Prime Trading, and CHS did not obtain prior authorization for each trade.

### D.    Defendants Attempt to Disassociate Themselves With the Fraud and Unauthorized Trading

65.    In June 2004, shortly after the Commission filed its injunctive action against Volf, Prime Trading, and CHS, the Management Company divested itself of all of its interest in Prime Trading.  The Management Company received no compensation for its interest in Prime Trading.

13

66.    The FDIC required Volf to elect between serving as president of Prime Trading and as vice-president of the Bank because of the appearance of a conflict of interest. Volf elected to remain an officer of the Bank and relinquished his responsibilities with Prime Trading.

67.    Prime Trading then changed its name to PT Holdings. PT Holdings is owned and operated by Larry Baker and Carrie Hurlburt, both former employees of Prime Trading. More specifically, Larry A. Baker is the president and principal owner of PT Holdings, and Carrie M. Hurlburt is a principal and director of PT Holdings

68.    PT Holdings continues to offer the same trading program as was offered by Prime Trading, and has taken over the accounts of all of Prime Trading's Program participants remaining in the Program.

69.    PT Holdings is located in the former offices of Prime Trading.

## VIOLATIONS OF THE ACT AND REGULATIONS

70.    Paragraphs 1 through 69 above are realleged and incorporated herein by reference into each Count alleged below.

71.    Section 166.2 of the Regulations, 17 C.F.R. § 166.2, makes it unlawful for any FCM, IB, or any of their APs to directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account:

> (a) Specifically authorized the futures commission merchant, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold); or
> (b) Authorized in writing the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the account without the customer's specific authorization; *Provided, however,* That if such futures commission merchant, introducing broker or any of their associated

14

persons is also authorized to effect transactions in foreign futures or foreign options without the customer's specific authorization, such authorization must be expressly documented.

72.   Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), make it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof . . .

>> (i) to cheat or defraud or attempt to cheat or defraud such other person; or . . .

>> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person. . . .

73.   Section 4c(b) of the Act, 7 U.S.C. § 6c(b), makes it unlawful to:

> [O]ffer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. . . .

74.   Regulation 33.10, 17 C.F.R. § 33.10, makes it unlawful for any person:

> [D]irectly or indirectly - (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; (c) to deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

75.   Section 4o(1) of the Act, 7 U.S.C. § 6o(1), makes it unlawful for: "[A] commodity

trading advisor, associated person of a commodity trading advisor, among others by use of the

mails or any means or instrumentality of interstate commerce, directly or indirectly - to engage in

15

any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

76.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that "[T]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his employment or office shall be deemed the act, omission, or failure of such individual association, partnership, corporation, or trust, as well as of such official, agent, or other person."

77.     Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides that "[A]ny person who commits, or who willfully aids, abets, counsels, . . . or procures the commission of a violation of this Act, . . . or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal."

## COUNT I

### Unauthorized Trading

78.     As described above, defendants Volf, Prime Trading, and CHS effected transactions in commodity interests for the accounts of customers without obtaining, before the transaction:  (a) specific authorization of the customers, or persons designated by the customers to control the account, in that neither the customers nor persons designated by the customers to control the account specified (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold; or, (b) authorization, in writing, for the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the accounts without the customers' specific authorization; all in violation of Commission Regulation 166.2, 17 C.F.R. § 166.2.

79.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the unauthorized trading committed by defendants Volf, Prime Trading, and CHS.

80.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the unauthorized trading committed by defendant Volf.

81.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the unauthorized trading of defendant Prime Trading.

82.    Each act of unauthorized trading, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Commission Regulation 166.2, 17 C.F.R. § 166.2, and defendants Volf, Prime Trading, CHS, the Management Company, the Bank, and PT Holdings are  liable for each and every act of unauthorized trading as a separate and distinct violation.

83.    Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their unauthorized trading and is therefore liable for such unauthorized trading pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

84.    The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their unauthorized trading.

## COUNT II

### Fraud in Connection with Commodity Futures Contracts

85.    As described above, defendants Volf, Prime Trading, and CHS in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of another person, where such contract for future delivery may be used for the purposes set forth in Section 4b(a)(2) of the Act: (i) cheated or defrauded or attempted to cheat or defraud such other person; and/or (iii) willfully deceived or attempted to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii).

86.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

87.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent. As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

88.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

89.    Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), and defendants Volf, Prime Trading, CHS, the Management Company, the

Bank, and PT Holdings are liable for each and every act of fraud trading as a separate and distinct violation.

90.    Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

91.    The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## COUNT III

### Fraud in Connection with Commodity Options Contracts

92.    As described above, defendants Volf, Prime Trading, and CHS in connection with offers to  enter into, the entry into, the confirmation of the execution of and the maintenance of commodity options transactions cheated or defrauded or attempted to cheat or defraud at least one other person; and deceived or attempted to deceive at least one other person by various other means, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 33.10.

93.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

94.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

95.     Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

96.     Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 33.10. and defendants Volf, Prime Trading, CHS, the Management Company, the Bank and PT Holdings are liable for each and every act of fraud as a separate and distinct violation.

97.     Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

98.     The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## COUNT IV

### Fraud by a Commodity Trading Advisor

99.     A commodity trading advisor is defined, pursuant to Section 1a(6) of the Commodity Exchange Act, as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in - any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility any commodity option authorized under section 4c of the Commodity Exchange Act.

100.    As described above defendants Volf, Prime Trading, and CHS, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in - any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility any commodity option authorized under Section 4c of the Act, 7 U.S.C § 6(c).

101.    As described above, defendants Volf, Prime Trading, and CHS, by use of the mails and other means or instrumentality of interstate commerce, directly or indirectly - engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon clients or prospective clients in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

102.    Based upon the facts alleged above, defendant Management Company was a principal, and defendant Prime Trading was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Management Company is liable for the fraud committed by defendants Volf, Prime Trading, and CHS.

103.    Based upon the facts alleged above, defendant Bank was a principal, and defendant Volf was its agent.  As a result, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(b), defendant Bank is liable for the fraud committed by defendant Volf.

104.    Based upon the facts alleged above, defendant PT Holdings is a successor corporation to defendant Prime Trading and as a result is liable for the fraud of defendant Prime Trading.

105.    Each act of fraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) and defendants Volf, Prime Trading, CHS, the Management Company, the Bank, and PT Holdings are  liable for each and every act of fraud as a separate and distinct violation.

106.    Based upon the facts alleged above, defendant Bank willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud and is therefore liable for such fraud pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

107.    The Bank is separately liable pursuant Section 13(a) of the Act, 7 U.S.C. § 13(c)(a) for each separate and distinct occasion upon which it willfully aided, abetted, counseled and worked in combination and concert with defendants Volf, Prime Trading, and CHS in their fraud.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)    an order finding that defendants violated Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b), and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2;

b)    a permanent injunction prohibiting defendants from engaging in conduct violative of Sections 4b(a)(2)(i) & (iii), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b) and Sections 33.10 and 166.2 of the Regulations, 17 C.F.R. §§ 33.10 and 166.2;

c)    an order prohibiting defendants from trading on or subject to the rules of any registered entity;

d)    an order directing defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

e)    an order directing defendants to make full restitution, pursuant to such procedure as the Court may order, to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

f)    an order directing defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

22

g)  such other and further remedial ancillary relief as the Court may deem appropriate.

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

/s/ Jan M. Folena

By: _____

JAN M. FOLENA, Chief Trial Attorney
*jfolena@cftc.gov*
MICHAEL J. OTTEN, Senior Trial Attorney
*motten@cftc.gov*
Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, NW
Three Lafayette Center
Washington, D.C. 20581
phone: (202) 418-5000/5313/5388
fax:  (202) 418-5531