**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| PRIME TRADING COMPANY, INC., | ) | Case No.: 1:08-CV-00154 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Kennelly |
| R. J. O'BRIEN & ASSOCIATES, INC., an | ) | Magistrate Judge Ashman |
| Illinois Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Defendant, R. J. O'Brien & Associates, Inc. (RJO), has moved for dismissal of the Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) alleging that Plaintiff, Prime Trading Company, Inc. (Prime), has failed to state any claim upon which relief can be granted. RJO's Motion to Dismiss should be denied because relief can be granted under all six claims asserted in the Amended Complaint.

When evaluating a motion to dismiss, a court tests the sufficiency of the complaint; it does not decide the merits. The plaintiff must merely plead sufficient facts to give fair notice of the claim and the grounds upon which it rests, and those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Serv., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (internal punctuation omitted); *see also Bell Atlantic v. Twombly,* 127 S. Ct. 1955, 1964-65 (2007). When ruling on a motion to dismiss, a court must treat well-pleaded allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.,* 507 F.3d 614, 618 (7th Cir. 2007). Under these standards, it is clear that RJO's Motion to Dismiss must be denied.

**SUMMARY OF FACTS ALLEGED**

Prime was a guaranteed broker of RJO, a futures commission merchant (Amended Complaint (hereinafter A.C.) ¶¶ 26, 29). From March 2002 through April 29, 2003, Prime used RJO to place orders at the commodities exchange on behalf of certain farmers in Nebraska and Kansas (the Farmers) (A.C. ¶¶ 25, 29, 45-49). Prime was a third-party beneficiary to a number of Security Agreements (the Security Agreements) between some of the farmers, RJO, and Sherman County Bank (the Bank) which allowed the Bank to fund margin calls on behalf of those farmers and which required RJO to comply with all orders from the Bank directing RJO to transfer, liquidate or redeem the positions in the farmers' accounts (A.C. ¶ 40; A.C., Ex. C ¶¶ 4(a), 4(b), 4(d)). RJO made statements to Prime in November and December 2002, in February 2003, and as late as April 24, 2003, that it would continue to accept orders to roll forward certain protective long positions despite outstanding margin calls and that any outstanding margin calls could be paid after the positions were rolled forward (A.C. ¶¶ 33, 37, 38, 42, 44, 53). In November 2002, February 2003 and for some orders placed on April 29, 2003, RJO did accept orders to roll forward certain protective long positions despite outstanding margin calls and outstanding margin calls were paid after the positions were rolled forward. (A.C. ¶¶ 33, 42, 45, 54). On April 29, 2003, Prime began entering orders to roll forward certain protective long positions as previously discussed with RJO and after some orders were accepted and filled by RJO, RJO informed Prime that RJO would no longer accept the protective orders and RJO subsequently required Prime to liquidate all remaining unprotected long future positions and certain short options as well (A.C. ¶¶ 45-48). RJO refused to accept the remaining orders and subsequently required Prime to liquidate all remaining unprotected long future positions and certain short options even though immediately after Prime was informed of RJO's refusal to

accept trades and RJO's requirement that positions be liquidated, Prime and the Bank notified RJO that the Bank would wire transfer an amount of funds sufficient to cover the outstanding margin calls within the hour. In fact, RJO stated that even if the funds were sent, RJO would continue to refuse orders from Prime (A.C. ¶¶ 45-48). Prime suffered damages as a result of RJO's refusal to accept trades on April 29, 2003, and RJO's requirement that other positions be liquidated. As a result of RJO's actions, the Farmers suffered losses in their accounts, Prime was subject to claims by the Farmers and the CFTC based upon those losses caused by RJO, and Prime made payments totaling $841,000 to the Farmers and CFTC, and Prime incurred $620,000 in attorney fees and costs defending against the claims made by the Farmers and the CFTC (A.C. ¶¶ 5-18, 48-50).

These facts alleged by Prime, if true, raise the possibility that Prime is entitled to relief far above a speculative level and are sufficient to state causes of action for breach of contract, indemnity, contribution, subrogation, negligent misrepresentation and promissory estoppel – detrimental reliance. As a result, RJO's Motion to Dismiss must be denied.

## **ARGUMENT**

### I. PRIME HAS STATED A CONTRACT CLAIM AGAINST RJO UPON WHICH RELIEF CAN BE GRANTED.

To state a claim for breach of contract, Prime must allege the following four elements: (1) the existence of a valid and enforceable contract; (2) performance by Prime; (3) breach of the contract by RJO; and (4) resultant injury to Prime. *Catania v. Local 4250/5050 of Commc'ns Workers of America*, 834 N.E.2d 966, 971 (Ill. App. Ct. 2005). Prime has alleged that it is a third-party beneficiary to the Security Agreements and/or that RJO and Prime entered into an oral agreement (the Oral Agreement) regarding RJO's execution of trades. (A.C. ¶¶ 51-54.) Prime has alleged that it performed under the Security Agreements and/or Oral Agreement.

(A.C. ¶ 52.) Prime has also alleged that RJO breached the Security Agreements and/or Oral Agreement and the implied obligations of good faith and fair dealing incorporated into the Security Agreement and or the Oral Agreement. (A.C. ¶¶ 56, 57.) Finally, Prime has also alleged that it suffered damages as a result of RJO's breaches. (A.C. ¶¶ 58-62.) Prime has stated a claim for breach of contract.

        A.        **Prime Is a Third-Party Beneficiary to the Security Agreements.**

Prime's allegations are sufficient to raise a question of fact as to whether it is a third-party beneficiary to the Security Agreements. In order to determine whether another is a third-party beneficiary, courts look to the contract to determine the intent of the parties. "Only third parties who are direct beneficiaries have rights under a contract." *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.,* 568 N.E.2d 365, 374 (Ill. App. Ct. 1991). "'The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract.'" *Id. at 374* (quoting *Wheeling Trust & Savings Bank v. Tremco, Inc.,* 505 N.E.2d 1045, 1048 (Ill. App. Ct. 1987)). "A third party is a direct beneficiary when the contracting parties have manifested an intent to confer a benefit upon the third party." *Id.* Whether a party is a third-party beneficiary is determined on a case-by-case basis. *Illinois Non-Profit Risk Management Ass'n v. Human Service Center of Southern Metro-East*, 884 N.E.2d 700, 712 (Ill. App. Ct. 2008).

Prime has alleged that it was a guaranteed broker of RJO whose role was to accept funds from customers and to use RJO to place orders at the commodities exchange on behalf of certain farmers in Nebraska and Kansas. (A.C. ¶¶ 25, 26, 29, 45-49.) Section 4(b) of the Security Agreements provides in pertinent part:

> In the event that orders are executed for the [farmer]'s account by a third party pursuant to the terms of a "give-up" or similar agreement among the

[farmer], [RJO] and such third party, [RJO] will use commercially reasonable efforts, subject to the terms of such agreement, to notify such third party that [RJO] will not thereafter accept trades executed by such third party for clearance into the [farmer]'s account.

In light of Prime's position as a guaranteed broker of RJO whose role was to accept funds from customers and to use RJO to place orders at the commodity exchange and the language in the Security Agreements regarding RJO's obligation to third parties such as Prime, Prime should be recognized as a third-party beneficiary to the Security Agreements.

### B. Prime and RJO Entered into an Oral Agreement regarding RJO's Acceptance of the Farmers' Trades.

In order for an oral agreement to be enforceable, "[t]he terms of the oral agreement must be definite and certain and there must be a meeting of the minds." *Kemp v. Bridgestone/Firestone, Inc.,* 625 N.E.2d 905, 910 (Ill. App. Ct. 1993). However, "oral contracts are proved not only by what the parties have said, but also by what they have done." *Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 213 (Ill. App. Ct. 1997). Further, the existence of a contract is generally a question reserved for the trier of fact. *Id*.

Prime's allegations are sufficiently definite and certain to establish a question of fact regarding the existence and terms of an oral agreement between Prime and RJO. Prime alleged that RJO and Prime agreed in November and December 2002, in February 2003 and as late as April 24, 2003, that RJO would continue to accept orders to roll forward certain positions despite outstanding margin calls and that any outstanding margin calls could be paid after the positions were rolled forward. (A.C. ¶¶ 33, 37, 38, 42, 44, 53.) In particular, on April 24, 2003, RJO specifically promised to accept specific trades in the near future knowing the current status of the accounts, the margins, and the market. Prime also alleged that RJO complied with the Oral Agreement when it accepted orders to roll forward certain positions despite outstanding margin

calls in November 2002 and February 2003 and that even on April 29, 2003, RJO initially accepted orders to roll those positions forward despite outstanding margin calls, but within a few hours, RJO reversed its position, refused to accept any further orders, required Prime to liquidate the orders it had accepted earlier in the day and required Prime to liquidate other positions. (A.C. ¶¶ 33, 42, 45, 54.) Prime has also alleged sufficient consideration for the Oral Agreement in that Prime continued to place trades with RJO and Prime refrained from obtaining the services of another commodity broker to place its orders.

### C. RJO Breached the Security Agreements and Oral Agreement.

Section 4(d) of the Security Agreements provides:

> If at any time [RJO] shall receive any Entitlement Order from the [Bank], [RJO] shall comply with such Entitlement Order without further consent by the [farmer] or any other Person, notwithstanding that such Entitlement Order may conflict with any instruction or notification by the [farmer] or any other Person.

(A.C., Ex. C.) Further, section 4(a) of the Security Agreements defines Entitlement Order as:

> [N]otifications, whether written or oral, communicated to [RJO] directing the transfer, liquidation, or redemption of the Trading Account Property (each such notification being referred to herein as an "Entitlement Order") originated by the [Bank], without any further consent by the [farmer] or any other person.

(A.C., Ex. C.) The Security Agreements clearly establish RJO's obligation to comply with the orders placed by Prime and the Bank on April 29, 2003, particularly when the Bank offered to wire transfer an amount of funds sufficient to cover the outstanding margin calls within the hour.

Further, RJO's representations that it would continue to roll forward certain positions despite outstanding margin calls and that any outstanding margin calls could be paid after the positions were rolled forward and RJO's actions of accepting those orders to despite outstanding margin calls constituted a modification to the Security Agreements and/or a separate Oral

Agreement. The relevant case law and facts regarding the existence of a separate Oral Agreement is set forth in the preceding section and will not be restated here.

With regard to the issue of the modification of the Security Agreements, Illinois law provides that "parties to a written contract may alter or modify its terms by a subsequent oral agreement, even though the terms of the contract preclude oral modification." *A.W. Wendell and Sons, Inc. v. Qazi*, 626 N.E.2d 280, 287 (Ill. App. Ct. 1993); *see also Household Financial Services, Inc. v. Coastal Mortg. Services, Inc.*, 152 F. Supp. 2d 1015, 1022 (N.D. Ill. 2001); *Tadros v. Kuzmak,* 660 N.E.2d 162, 170 (Ill. App. Ct. 1995). Prime provided consideration for the modification by continuing to place trades with RJO and refrained from obtaining the services of another commodity broker. (A.C. ¶¶ 33, 42, 45, 87.)  In any regard, there is no requirement that new consideration be given for the modification of existing contract; "mutual agreement is sufficient consideration and new consideration is not necessary where performance of a written contract is waived." *Nelson v. Estes*, 507 N.E.2d 530, 533 (Ill. App. Ct. 1987) (citations omitted). Further, "the issues of the existence of an oral modification, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact." *A.W. Wendell*, 626 N.E.2d at 288.

Prime has sufficiently alleged that pursuant to the original terms of the Security Agreements, the modifications to the Security Agreements and/or the terms of the Oral Agreement, RJO was obligated to accept the orders placed by Prime and the Bank on April 29, 2003, and that RJO was not entitled to liquidate the long future positions and short option positions over the objections of Prime and the Bank. Prime has also sufficiently alleged that RJO breached the terms of the Security Agreements and/or the Oral Agreement when it refused to accept the protective orders, required that the long positions and short option positions be

liquidated, failed to notify the Bank within a reasonable time of outstanding margin calls, and failed to give the Bank a reasonable opportunity to meet the margin call. (A.C. ¶ 55.)

Notably, "[a] broker's closing out of open positions in a commodity account without a margin call for additional funds constitutes unauthorized trading in violation of § 4b [of the Commodity Exchange Act]." *Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 990 (S.D.N.Y. 1984). Further, a broker has no right to sell without the client's authority where he has sufficient margin and if the broker agrees to carry an account for a certain time or until a certain event without further margins, he is liable in damages for closing the account before that time. *J.W. Tipton Cotton Co. v. Clayton*, 99 S.W.2d 549, 554 (Mo. Ct. App. 1936). "To justify a broker in closing out the transaction on depletion of margins, it is incumbent on him first to make demand of the client for further margins, and the demand must be such as will give the client a reasonable notice or time to comply therewith; and if a broker waives a default in complying with such a demand, he cannot close the transaction until a new demand is made." *Id.* (quoting 9 C.J. p.546); *see also Baghdady v. Robbins Futures, Inc.*, 244 F. Supp. 2d 916 (N.D. Ill. 2003) (Allegation that customer was told he would have "all day" to liquidate his positions if he wired $40,000 precluded summary judgment for defendants who claimed that the customer account agreement gave them the right to liquidate customer's account for failure to meet $100,000 margin call); *Nanlawala v. Jack Carl Associates, Inc.*, 669 F. Supp. 204 (N.D. Ill. 1987) (There existed a genuine issue of material fact as to whether futures commission merchant gave investor reasonable time to comply with margin call under customer agreement). The allegations of the Amended Complaint sufficiently allege RJO wrongfully liquidated the positions.

Moreover, Prime's breach of contract claim is further supported by its allegations that RJO's actions also constitute a breach of the implied covenant of good faith and fair dealing

which Illinois law incorporates into every contract. To plead a breach of the implied covenant, a plaintiff must allege (1) that the defendant had wide discretion in contract performance, and (2) the defendant exercised this discretion in bad faith. *Peterson v. H & R Block Tax Services, Inc.*, 971 F. Supp. 1204, 1211 (N.D. Ill. 1997); *see also Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004). "The covenant is invoked to determine the intent of the parties where a contract is ambiguous and subject to more than one construction." *LaSalle Bank National Ass'n v. Moran Foods, Inc.,* 477 F. Supp. 2d 932, 937 (N.D. Ill. 2007). Prime contends that the Security Agreements and the Oral Agreement unambiguously required RJO to accept the trades on April 29 and prohibited RJO from requiring the liquidation of the long and short positions. However, to the extent it could be determined that the Security Agreements and Oral Agreement are ambiguous in those regards, Prime has sufficiently alleged that RJO breached the covenant of good faith and fair dealing. (A.C. ¶¶ 56, 57.)

### D.   Prime Has Sufficiently Alleged that It Incurred Damages as a Result of RJO's Breaches.

Prime has alleged that it suffered damages as a result of RJO's refusal to accept trades on April 29, 2003, and RJO's requirement that other positions be liquidated. As a result of RJO's actions, the Farmers suffered losses in their accounts and Prime was subject to restitution and negligence claims by the Farmers and the CFTC based upon the losses caused by RJO. Prime made payments totaling $841,000 to the Farmers and CFTC related to those losses and incurred $620,000 in costs in defending those claims.

The CFTC Complaint alleged that Prime committed fraud and executed unauthorized trades in the Farmers' accounts, and some of the Farmers asserted claims against Prime for violations of the Commodity Code, Commodity Exchange Act, fraud, breach of a fiduciary duty

and negligence. (A.C. ¶¶ 8, 17.) Part of the CFTC's contention was that Prime placed non-hedge transactions in hedge accounts. (A.C., Exhibit B ¶ 25.) Prime has alleged sufficient facts to establish that RJO's required liquidation of the long and short positions against the express instructions of Prime and the Bank constituted unauthorized trading. *See, e.g., Cauble,* 594 F. Supp. at 990. Further, Prime has alleged that RJO placed allegedly non-hedge trades in hedge accounts. (A.C. ¶ 64.) These allegations are sufficient to establish a causal connection between Prime's damages and RJO's breaches.

The causal connection between Prime's damages and RJO's breaches is also established by the fact that Prime would not have had to make the $841,000 in restitution claims nor expend the $620,000 in defending against the restitution claims but for RJO's breaches. Had RJO accepted the orders on April 29, 2003, and not required the liquidation of the long and short positions, the Farmers would not have incurred any losses in their accounts because within 10 days following April 29, 2003, the market rallied and the Farmers would have met the goal of an approximately 25 cent per bushel increase in value. (A.C. ¶ 49.) If the customers had not suffered any losses in their accounts, Prime would not have been liable for any restitution damages even if it had engaged in fraudulent or unauthorized trading. *See Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, No. 83 Civ. 6291, 1992 WL 27154, 1 (S.D.N.Y. 1992) (not reported in F. Supp.) (It was held that misevaluation of an account and unauthorized trades hurt the plaintiff, "but recovery from these two negatives was foreclosed by the liquidation. Without the liquidation plaintiff might have … ridden out the financial strictures caused by the other two misfortunes."); *see also Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.,* 176 F.3d 601 (2nd Cir. 1999) (Buyer did not suffer any compensable damages related to misrepresentations because he recognized a profit from the sale of stock); *Rubenstein v. IU*

*Intern. Corp.*, 506 F. Supp. 311 (E.D. Pa. 1980) (Evidence that plaintiff sold stock at profit demonstrated he suffered no damage, precluding a claim under the Securities Exchange Act).

Prime's claim against RJO is somewhat analogous to a situation where a person injured by a third party can collect against the third party for the original injury as well as any aggravation of an injury caused by a physician's malpractice, and the third party has a right to maintain an action against the physician for the damages attributable to the physician's malpractice. See, e.g., *Gertz v. Campbell*, 302 N.E.2d 40 (Ill. 1973). In the present case, the Farmers were able to collect $841,000 against Prime for the aggravation of their injury caused by RJO, and Prime is entitled to collect that amount from RJO. Furthermore, Prime is entitled to recover the $620,000 in attorney fees and costs it incurred in defending against the restitution claims because these attorney fees are ordinary damages and not the costs of litigation in the present case. *Shacket v. Roger Smith Aircraft Sales, Inc.*, 651 F. Supp. 675, 697 (N.D. Ill. 1986); *see also Duignan v. Lincoln Towers Ins. Agency, Inc.*, 667 N.E.2d 608, 613 (Ill. App. Ct. 1996) (attorney fees and costs incurred as a result of defendant's conduct may be awarded as a form of damages); *Bituminous Casualty Corp. v. Commercial Union Insurance Co.*, 652 N.E.2d 1192, 1196 (Ill. App. Ct. 1995) (attorney fees incurred in a third-party complaint that was the result of defendant's breach of contract are recoverable). Prime has stated a cause of action for recovery of attorney fees it incurred in defending against the restitution claims.

II.     **PRIME HAS STATED A CLAIM FOR INDEMNITY.**

Prime's indemnification claim is based upon implied indemnity. Illinois recognizes two forms of implied indemnity: implied tort indemnity and implied contractual indemnity. *Installation Services, Inc. v. Electronic Research, Inc.*, No. 04 C 6906, 2005 WL 645244, 3 (N.D. Ill. 2005) (not reported in F. Supp.). Prime has stated a claim for implied tort indemnity by alleging facts

that support that (1) it had a pre-tort relationship with RJO, and that (2) similar to a tortfeasor held liable for the subsequent medical malpractice of a physician, Prime was vicariously liable for the damages suffered by the Farmers as a result of RJO's unauthorized liquidation of positions, negligent misrepresentations, negligence and bad faith in refusing to place trades and requiring liquidation of positions on April 29, 2003, and RJO's negligent placement of allegedly non-hedge trades in hedge accounts. (A.C. ¶ 65-70.)  *See BCS Ins. Co. v. Guy Carpenter & Co.*, 490 F.3d 597, 603 (7th Cir. 2007); *see also Goodman v. H. Hentz & Co.*, 265 F. Supp. 440, 447 (N.D. Ill. 1967) (Violation of section 6b of the Commodity Exchange Act is a tort).  Further, under the Commodity Exchange Act, a futures commission merchant is strictly liable for the fraud of its broker.  *Anspacher & Associates, Inc. v. Henderson*, 854 F.2d 941, 945 (7th Cir. 1988); *Cange v. Stotler and Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987).  Similarly, Prime has stated a claim for implied contractual indemnity by alleging that RJO's breaches of the Security Agreements and Oral Agreement caused Prime to breach its separate agreements with the Farmers. (A.C. ¶ 65-70.)  *See Installation Services* 2005 WL 645244 at 4.  As stated previously, but for RJO's refusal to place trades and RJO's requirement that positions be liquidated, the Farmers would not have lost any money in their accounts and Prime would not have been liable for any restitution even if it had engaged in fraudulent or unauthorized trading.

### III.    PRIME HAS STATED A CLAIM FOR CONTRIBUTION.

In order to state a claim for contribution, Prime must allege that it and RJO in contribution are both subject to liability in tort to the Farmers and that the liability of Prime and RJO in contribution arises out of the same injury and that Prime has paid in excess of its portion of liability.  *See Muirfield Village-Vernon Hills, LLC v. K. Reinke, Jr. and Co.*, 810 N.E.2d 235, 245 (Ill. App. Ct. 2004); *Jannotta v. Kirkwood*, 702 F. Supp. 165, 168 (N.D. Ill. 1988).  Prime

has met this burden. Prime has alleged that (1) the CFTC and Farmers have asserted restitution and negligence claims against Prime for the losses the Farmers sustained, (2) that RJO is liable for those damages as a result of RJO's unauthorized trading, negligent misrepresentations, negligence and bad faith in refusing to place trades and requiring liquidation of positions on April 29, 2003, and RJO's negligent placement of allegedly non-hedge trades in hedge accounts, and (3) Prime paid in excess of its pro rata share of the common liability. (A.C. ¶¶ 17, 72-75.) Once again, but for RJO's refusal to place trades and RJO's requirement that positions be liquidated, the Farmers would not have lost any money in their accounts and Prime would not have been liable in tort for any restitution even if it had engaged in fraudulent or unauthorized trading. Further, Prime has sufficiently alleged that RJO was involved in the torts of allegedly fraudulent placing of non-hedge trades in hedge accounts, (A.C. ¶¶ 72), and unauthorized trading which were asserted against Prime. (A.C. ¶¶ 45-50.) As previously stated, the CFTC's and Farmers' alleged violations of section 6b of the CEA constitute torts. See, *Goodman,* 265 F. Supp. at 447.

### IV.     PRIME HAS STATED A CLAIM FOR SUBROGATION.

"[U]nder Illinois law, a plaintiff seeking equitable subrogation must establish that: (1) he paid a claim or debt for which a third party is primarily liable and that he seeks to enforce a right against that third party; and (2) he was compelled to satisfy the debt and was not a volunteer." *Liberty Mut. Ins. Co. v. Construction Management Services, Inc.*, No. 99 C 6906, 2003 WL 22071481, 1 (N.D. Ill. 2003) (not reported in F.Supp.2d). These allegations are included in the Amended Complaint and as a result, Prime has stated a claim for subrogation. (A.C. ¶¶ 77-80.) RJO is primarily liable for the Farmers' damages because but for RJO's refusal to place trades and RJO's requirement that positions be liquidated, the Farmers would not have suffered any

loss. Prime did not voluntarily make any of the restitution payments; it made the payments because the Farmers and CFTC were asserting claims against Prime for restitution and Prime had some obligation to pay the restitution based upon its relationship with the Farmers and its status as a guaranteed broker of RJO. Once again, the CFTC's and Farmers' alleged violations of section 6b of the CEA constitute torts. *See Goodman,* 265 F. Supp. at 447.

### V.     PRIME HAS STATED A CLAIM FOR NEGLIGENT MISREPRESENTATION.

Contrary to RJO's assertions, Prime has alleged sufficient facts to establish the six elements of a claim for negligent misrepresentation. (A.C. ¶¶81-94); *see also First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (Ill. 2006). Prime's allegation that on April 24, 2003, RJO stated it would accept the trades and RJO's acceptance of some of those trades on April 29, 2003, just prior to its decision to stop accepting those trades are sufficient allegations of a false statement of material fact. *See, e.g., Broadview Financial v. Entech Mgmt. Serv. Corp.*, 859 F. Supp. 444, 453 (D. Colo. 1994). Further, pursuant to the definition of negligent misrepresentation found in the Restatement (Second) of Torts § 552 (1997), it is sufficient to allege the "supply of false information for the guidance of others in their business transactions" and there is no requirement to allege "a false statement of material fact" as referenced in *First Midwest Bank.* Further, statements of matters in the future, if affirmed as fact, may amount to misrepresentations. *Duhl v. Nash Realty, Inc.*, 429 N.E.2d 1267, 1274 (Ill. App. Ct. 1981). The duty a futures commission merchant owes a client to provide accurate information is an extra-con*tractual duty arising from its professional obligations. R.J. O'Brien & Associates, Inc. v. Forman*, 298 F.3d 653, 656 (7th Cir. 2002). Finally, the issue of whether a party is in the "business of supplying information for the guidance of others" generally requires a case-specific factual inquiry. *Id*. at 656-57.

## VI. PRIME HAS STATED A CLAIM FOR PROMISSORY ESTOPPEL – DETRIMENTAL RELIANCE.

Prime has stated a cause of action for promissory estoppel by alleging that (1) RJO made an unambiguous promise to Prime that it would continue to accept the protective long positions that were part of Prime's trading strategy; (2) Prime relied upon that promise by continuing to place trades with RJO, refraining from instituting alternative trading strategies and refraining from obtaining the services of another broker; (3) Prime's reliance was expected and foreseeable by RJO; and (4) Prime relied on the promise to its detriment. (A.C. ¶¶95-104.)  Contrary to RJO's assertions, the promises were unambiguous in that they referred to the specific trades that Prime had previously requested and RJO had previously accepted.  The promise on April 24, 2003 was particularly unambiguous in that RJO promised to allow Prime to roll over the May put options that were about to expire.  Further, RJO in fact did accept some of those trades on April 29, 2003, just prior to its decision to stop accepting those trades.  RJO is also incorrect in asserting that there is no nexus between RJO's actions and Prime's damages.  As stated numerous times, but for RJO's refusal to place trades and RJO's requirement that positions be liquidated, the Farmers would not have lost any money in their accounts and Prime would not have been liable for any restitution even if it had engaged in fraudulent or unauthorized trading.

## CONCLUSION

For the foregoing reasons, Plaintiff, Prime Trading Company, Inc., respectfully requests that the pending Motion to Dismiss be denied in its entirety.  In the alternative, Plaintiff respectfully requests leave to file a Second Amended Complaint.

Dated this 11th day of July, 2008.

                                          PRIME TRADING COMPANY, INC., Plaintiff
                                      By     s/Edward H. Tricker
                                              Edward H. Tricker, Neb. No. 15504

                      Bruce A. Smith, Neb. No. 20162
                      Attorney for Plaintiff
                      WOODS & AITKEN LLP
                      301 South 13th Street, Suite 500
                      Lincoln, Nebraska  68508
                      Telephone:  402-437-8500
                      Facsimile:   402-437-8558
                      etricker@woodsaitken.com
                      bsmith@woodsaitken.com

and

                      Jeffrey Schulman, No. 2513080
                      Attorney for Plaintiff
                      WOLIN & ROSEN, LTD.
                      55 West Monroe, 36th Floor
                      Chicago, Illinois  60603
                      Telephone:  312-424-0600
                      Facsimile:   312-424-0660
                      jschulman@wolinlaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Vincent J. Connelly**
courtnotification@mayerbrown.com
- **Marshall E. Hanbury**
courtnotification@mayerbrown.com
- **Doressia LaShun Hutton**
courtnotification@mayerbrown.com
- **Jeffrey A. Schulman**
jschulman@wolinlaw.com

                      s/Bruce A. Smith
                      Bruce A. Smith, Neb. No. 20162
                      Attorney for Plaintiff
                      WOODS & AITKEN LLP
                      301 South 13th Street, Suite 500
                      Lincoln, Nebraska  68508
                      Telephone:  402-437-8500
                      Facsimile:   402-437-8558
                      bsmith@woodsaitken.com